IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § | MDL-1446 |
| | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |
| AMERICAN NATIONAL INSURANCE COMPANY, et al., | § § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. G-02-723 |
| | § | |
| CITIGROUP, INC., et al., | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause alleging securities fraud under Texas statutory and common law *inter alia* are (1) Defendant Schuyler M. Tilney's ("Tilney's")[1] motion to dismiss (instrument #47) Plaintiffs' First Amended Complaint under Fed. R. Civ. P. 9(b) and 12(b)(6); and (2) Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated and

_____

[1] Tilney is identified in the First Amended Complaint as the former Managing Director of Global Energy and Power, Global Marks & Investment Banking for Merrill Lynch and as a Texas resident. #46 at 4, ¶ 16.  He is sued personally in his individual capacity as well as in his official capacity as an agent/officer of Merrill Lynch.  *Id.* at 73, ¶ 320.

Merrill Lynch & Company, Inc.'s (collectively, "Merrill Lynch's")[2] partial motion to dismiss (#48) Plaintiffs' First Amended Complaint.[3]

Plaintiffs American National Insurance Company, American National Investment Accounts, Inc., SM&R Investments, Inc., American National Property and Casualty Company, Standard Life and Accident Insurance Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company were purchasers or "holders" of Enron and Enron-related securities from 1997-2001, the "relevant" period of

---

[2] Initially Defendants Citigroup, Inc., Salomon Smith Barney (together, "Citigroup"), and James P. Reilly were co-movants, but were dismissed pursuant to a stipulation (#64). Thus the Court addresses only the claims against Merrill Lynch and Schuyler Tilney in reviewing the motions.

[3] In the Memorandum of Law in support of the partial motion to dismiss, Merrill Lynch adds, to the list of Plaintiffs, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company because

> [b]ased on the limited information disclosed in the Complaint it appears that the Farm Family Life Insurance Company purchased an Enron bond in 1992 and continues to hold that bond. Plaintiffs Farm Family Life Insurance Company and Farm Family Casualty Insurance Company purchased preferred shares of Enron Capital L.L.C. in 1993 and continue to hold those shares. National Western Insurance Company purchased Enron bonds in 1992 and 1993 and continues to hold those bonds. *See* Cplt at ¶37.

#49 at 1-2 n.1. In their surreply, Plaintiffs state that these three Plaintiffs did not assert Texas Securities Act claims against Defendants, but did join the other Defendants in asserting the fraud claims.

alleged wrongdoing.[4]   Specifically, Plaintiffs American National
Insurance Company, American National Investment Accounts, Inc.,
SM&R Investments, Inc., and Standard Life and Accident Insurance
Company bought Enron common stock during the "relevant" period.
American National Insurance Company purchased Enron commercial
paper and an Enron bond in 2001.   Farm Family Life Insurance
Company and Farm Family Casualty Insurance Company purchased Enron
preferred stock in 1993, and Farm Family Life Insurance
additionally purchased an Enron bond in 1992; these entities held
these securities throughout the relevant period.    Finally,
National Western Life Insurance Company bought Enron bonds in 1992
and 1993 and continued to hold them through the relevant period.
#46 at ¶ 37.   Plaintiffs claim they suffered substantial losses
in the value of their securities when Enron collapsed and filed
for bankruptcy protection  on December 2, 2001.

        Plaintiffs allege that Defendants helped Enron conceal
its deteriorating financial condition from the investing public
and conspired with Enron to "cook its books" through deceptive
transactions, specifically the Nigerian Barge, Power Trades, and
LJM2 transactions in the end of 1999 and in 2000, with ongoing
effects.  Merrill Lynch and others purportedly devised or executed
these transactions to hide Enron's fraudulent accounting from

---

[4] In a "holder" claim, the plaintiff/securities holder alleges
not that the defendant wrongfully induced the plaintiff to purchase
or sell stock during the "relevant" period, but that the defendant
wrongfully induced the plaintiff, who had purchased his securities
previously, to continue holding his stock and seeks as damages the
diminished value of the stock allegedly caused by the defendant's
misrepresentations.

rating agencies and investors, as well as issued through its
analysts, even as Enron was descending into bankruptcy in late
2001, "buy" or "strong buy" recommendations for Enron securities,
which Merrill Lynch knew would be "widely disseminated in the
financial news media" and would be "available to Plaintiffs and
other investors." First Amended Complaint (#46) at ¶¶ 34, 510-24.
"The conspiracy amounted to a giant Ponzi scheme whereby
Defendants helped Enron raise ever-increasing amounts of cash to
make outstanding debt payments and maintain a facade of "'normal'
operations." #46 at 4, ¶ 26. The complaint further asserts that
the Nigerian Barge Transaction and the Power Trades Transaction
resulted in Enron's recognition of approximately $60 million in
income for the fourth quarter of 1999, raising net income from
$199 million to $259 million, a 30% increase; the transactions
also enabled Enron to meet its earnings targets. *Id.* at ¶¶ 329-
30. The ultimate result was to increase Enron's stock price and
enable Enron to raise millions of dollars from the bond market at
investment grade interest rates. *Id.* at ¶ 330. The factual
allegations against Merrill Lynch and Tilney are mostly contained
in ¶¶ 304-464 of the First Amended Complaint (#46).

The governing complaint asserts four causes of action
under Texas law: (1) aiding and abetting statutory fraud by Enron
under the Texas Securities Act, Texas Revised Civil Statute
Annotated Article 581-33F(2)(West 2002)("TSA"); (2) aiding and
abetting statutory fraud by Enron under Section 27.01(d) of the
Texas Business and Commerce Code (West 2002); (3) common law
fraud; and (4) conspiracy to commit fraud. In essence Defendants'

motions seek to dismiss the last three causes of action, all holder claims, and possible time-barred claims asserted under the TSA.[5]

## I.  Standards of Review

As stated in 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civ.3d* § 1204 at 104-05 (West 2004),

> The manner and details of pleading in the federal courts are governed by the Federal Rules of Civil Procedure regardless of the source of substantive law to be applied in the particular action. . . . It no longer can be doubted that the rules regarding the standard of specificity to be applied to federal pleadings, the pleadings allowed in the federal courts, the form of the pleadings, the special requirements for pleading certain matters, the allocation of the burden of pleading among the parties, and the signing of pleadings by an attorney of record or an unrepresented party, all are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting.

*See also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 388 F. Supp.2d 780, 783-84 (S.D. Tex. 2005)(and cases cited therein).

## A.  Rule 9(b)

> Federal Rule of Civil Procedure 9(b) provides, In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person must be averred generally.

---

[5] Plaintiffs also claim that because  each Defendant violated and/or conspired with Enron to violate section 32.34 (commercial bribery) and/or section 32.47 (fraudulent concealment of a writing) of the Texas Penal Code, they are entitled to exemplary damages under the Texas Civil Practice & Remedies Code § 41.008(c).  First Amended Complaint, #46 at 106, ¶464.

"In every case based upon fraud, Rule 9(b) requires the plaintiff to allege as to each individual defendant 'the nature of the fraud, some details, a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2001).  In a securities fraud suit, the plaintiff must plead with particularity the circumstances constituting the alleged fraud:  Rule 9(b) requires the plaintiff to "'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'"  *Southland Securities Corp. v. INspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004), *quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997).  "'In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.'"  *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006), *quoting United States ex. rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004).

Although Rule 9(b) allows a plaintiff to plead intent to deceive or defraud generally, a mere conclusory statement that the defendant had the required intent is insufficient; the plaintiff must set forth specific facts that raise an inference of fraudulent intent, for example facts that show the defendant's motive. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068

(5th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994).   Intent to deceive or defraud usually must be proved by circumstantial evidence, but to establish a material fact, that evidence "'must transcend mere suspicion.'"   *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.--Houston [14[th] Dist.] 2003, pet. denied).   Although a party's intent to defraud is determined at the time the party made the misrepresentation, "it may be inferred from the party's subsequent acts after the representation is made."   *Id.; see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 431, 434 (Tex. 1986).   The court should not view each piece of circumstantial evidence separately, but should weigh the evidence as a whole.   *IKON*, 125 S.W.3d at 124.   "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d at 434.

The Fifth Circuit, although construing Rule 9(b) strictly, has recognized an exception and permits the requirements to be "relaxed" where facts relating to the fraud are "peculiarly within the perpetrator's knowledge"; then the alleged fraud "may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief." *United States ex rel. Russell v. EPIC Healthcare Management Group*, 193 F.3d 304, 308 (5th Cir. 1999), *citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)(warning that the exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.").   The relaxed

standard is not applicable where the information is available from another source or where the plaintiff fails to allege a factual basis for his beliefs. *Sealed Appellant I v. Sealed Appellee I*, 156 Fed. Appx. 630, 634 (5th Cir. 2005)(plaintiff must allege sufficient factual basis for his belief defendant committed fraud, e.g., particular documents containing false statements, identified by number, date or otherwise, or explain how he tried, but failed to obtain the information, whom he contacted, etc.).

A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). If it appears that given an opportunity to amend the pleading, the plaintiff would be able to state a claim upon which relief could be granted, the court should grant leave to amend. *People's Choice Home Loan, Inc. v. Mora*, No. 3:06-CV-1709-G, 2007 WL 708872, *4 (N.D. Tex. Mar. 7, 2007), *citing Kennard v. Indianapolis Life Ins. Co.*, 420 F. Supp.2d 601, 608-09 (N.D. Tex. 2006).

**B.  Rule 12(b)(6)**

Dismissal under Rule 12(b)(6) is disfavored and a motion to dismiss under the rule is rarely granted. *Lowrey v. Texas A&M University System*, 117 F.3d 242, 247 (5th Cir. 1997). The court must construe the complaint liberally in favor of the plaintiff and all well pleaded facts must be taken as true and any doubts regarding the sufficiency of the claim must be resolved in favor of the plaintiff. *Id.; Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003). Nevertheless conclusory allegations and

unwarranted factual deductions will not suffice to avoid a motion to dismiss. *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 379 (5th Cir. 2003). Dismissal is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lowrey,* 117 F.3d at 247, *citing Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).

## II.  Applicable Substantive Law

**A. TSA**

A claim for secondary liability for another party's primary violations of the TSA art. 581-33(F)(2) may be based on either (1) control person liability ("[a] person who directly or indirectly controls a seller, buyer, or issuer of a security") or on (2) aider and abettor liability (permitting suit against one "who directly or indirectly with intent to deceive or defraud or with a reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security."). Plaintiffs' claims against Merrill Lynch and Tilney here fall into the second category. An aider and abettor is jointly and severally liable with the primary violator "to the same extent as if he were" the primary violator. Art. 581-33F(2).

To state a claim for aider and abettor liability under the TSA, a plaintiff must allege that (1) there was a primary violation of the securities laws, here allegedly by Enron,[6] (2) the

---

[6] A primary violator is a person who "offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they

aider and abettor had a general awareness of his role in the violation, (3) the aider and abettor gave substantial assistance in the violation, and (4) the aider and abettor intended to deceive the plaintiff or acted with reckless disregard for the truth of the primary violator's misrepresentations. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp.2d 549, 568 (S.D. Tex. 2002). *See also Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 842 (Tex. 2005)(holding that as the statute's scienter requirement for aiding and abetting, "the TSA's 'reckless disregard for the truth or the law' standard means that an alleged aider can only be held liable if it rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator. . . . In order to perceive such a risk, the alleged aider must possess a ''general awareness that his role was part of an overall activity that was improper.''").[7]  Furthermore, "the TSA does not require

---

are made, not misleading."  Art. 581-33A(2).

[7] The Texas Supreme Court explained that "policy concerns favor[ed] a subjective standard" over a lesser negligence "should have known" standard for aiders and abettors because

> [i]n most cases, the alleged aider and abettor
> . . . will merely be engaging in customary
> business activities, such as loaning money,
> managing a corporation, preparing financial
> statements, distributing press releases,
> completing brokerage transactions, or giving
> legal advice.  If each of these parties will
> be required to investigate the ultimate
> activities of the party whom he is assisting,
> a burden may be imposed upon business
> activities that is too great. . . The
> essential point is that imposition of a duty
> to investigate under the guise of a "should
> have known" standard in essence would amount

the aider to have had direct dealing with the defrauded party;
indeed a person who 'materially aids a seller' may have no contact
at all with the investors." *Sterling Trust*, 168 S.W.3d at 843.[8]
The TSA also does not require an investor to prove he relied on

---

> to eliminating scienter as a necessary element
> in imposing aiding and abetting liability and
> the substitution of a negligence standard.

*Sterling Trust*, 168 S.W.3d at 842, *quoting* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting Conspiracy*, In Pari Delicto, *Indemnification, and Contribution*, 120 U. PA. L. Rev. 597, 632-22 (1972).

[8] The First Amended Complaint (#46) at ¶¶ 479-85 tracks the language of the statute in alleging that Merrill Lynch is secondarily liable under Article 581-33F(2) and thus jointly and severally liable with primary violator Enron as if Merrill Lynch were the seller or issuer of Enron and Enron-related securities. It asserts that, intending to deceive the public and with reckless disregard for the truth, Merrill Lynch entered into the Nigerian Barge and Power Trades Transactions, which had no legitimate business purpose but served solely to deceive the investing public, with "handshake" agreements that would not be properly reported in SEC financial statements and would conceal the truth from the investors; it also allegedly disseminated "glowing analyst reports" based on Enron's financial statements, which it knew were false because they were based on Enron's deceptive financial statements. Merrill Lynch allegedly knew before the transactions were entered into that they would be improperly reported in financial statements filed with the SEC and thus illegally filed. Merrill Lynch's allegedly fraudulent conduct "was material because a reasonable investor would consider the existence of accounting fraud-particularly criminal fraud-important in a decision to buy or sell or hold a security, and because the two Transactions "had a substantial impact on Enron's reported fourth quarter and annual 1999 (and therefore, all subsequent) financial statements."

> The First Amended Complaint at ¶ 494 also charges that
>
> Tilney, in violation of Article 581-33F(2), directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aided Enron, a primary violator under Article 581-33A. As such, Tilney is jointly and severally liable with Enron to the same extent as if Tilney was the seller or issuer of Enron and/or Enron-related securities.

alleged misrepresentations or omissions. *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000).

**B.   Section 27.01 of the Texas Business and Commerce Code**

For a primary violation of the statute the elements of fraud under the Texas Business and Commerce Code § 27.01(a)(1)(2002) in relevant part are:

> (1) false misrepresentation of a past or existing material fact . . .
> (A) made to a person for the purpose of inducing that person to enter into a contract; and
> (B) relied on by that person in entering that contract.

Plaintiffs have alleged facts to show that Enron, though not a party here, was such a primary violator.  Moreover, because the statute is derived from common law fraud, Plaintiffs must show that they actually and justifiably relied upon Enron's allegedly fraudulent misrepresentations. *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 & n.4 (5th Cir. 1990), *abrogated on other grounds, Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995).  The burden to show "justifiable" reliance is lighter than that for "reasonable reliance." *Id.* at 1025.  "To determine justifiability, courts inquire whether–given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud-it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.* at 1026.

Unlike common law fraud, Section 27.01 does not require proof of a defendant's knowledge or recklessness in order to recover actual damages. *Diversified, Inc. v. Walker*, 702 S.W.2d

717, 723 (Tex. App.-Houston [1st Dist. 1985, writ ref'd n.r.e.)("Sec. 27.01 is generally less demanding than common law fraud, imposing liability upon the maker of a misrepresentation without proof that he intended to deceive or knowledge that the representation was false."); *Robbins v. Capozzi*, 100 S.W.3d 18, 26 (Tex. App.--Tyler 2002, no pet.)("A cause of action for statutory fraud differs from the common law cause of action only in that it does not require proof that the false representation was made knowingly or recklessly," but it must be made with the intent to induce the claimant into entering the transaction), *citing Larsen v. Carlene Langford & Assoc., Inc.*, 41 S.W.3d 245, 248 (Tex. App.--Waco, 2001, pet. denied); *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.--Waco 2000, pet. denied).

Plaintiffs bring their claims against Merrill Lynch and Tilney under § 27.01(d) for aiding and abetting Enron:

> A person who (1) has actual awareness of the falsity of a representation . . . made by another person and (2) fails to disclose the falsity of the representation . . . to the person defrauded, and (3) benefits from the false representation or promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.[9]

_____

[9] The First Amended Complaint at ¶¶ 497-98 asserts,

> Each Defendant conspired to violate, aided and/or abetted violations of § 27.01 by making false representations of past or existing material facts or omitting to state past or existing material fact necessary in order to make the statements made, in the light of the circumstances under which they

were made, not misleading.

Such false representations were made for the purpose of inducing Plaintiffs to enter into contracts for the purchase of Enron securities. Such representations were relied upon by Plaintiffs in entering into such contracts.

It continued to allege at ¶ 504 that Merrill Lynch violated § 27.01,

(a) Merrill had actual knowledge of the accounting gimmickry and fraudulent representations made by Enron about its financial condition because Merrill knew that its participation in the Nigerian Barge Transaction and the Power Trades Transaction was not properly disclosed in Enron's SEC 10-Q and 10-K filings.
(b) Merrill never revealed the falsity of Enron's misrepresentations or its material and deceptive omissions prior to Enron's bankruptcy filing.
(c) Merrill substantially benefited from conspiring with and enabling Enron to publish and file financial statements containing false representations and omissions of material fact. Tellingly, Merrill Lynch received more fees from Enron than any other investment bank in 1999, the year that Merrill completed the Nigerian Barge Transaction and the Power Trades Transaction.

With regard to Tilney, the complaint at ¶ 506 repeats the same allegations in (a) and (b), but adds to (b) and modifies (c) as follows:

(b) . . . Importantly, rather than cooperate with, and testify before, governmental bodies investigating Enron's collapse, Tilney refused to testify by invoking his Fifth Amendment privilege against self-incrimination. He has also repeatedly invoked the Fifth Amendment in connection with Enron.
(c) That Tilney benefited from his aid in concealing Enron's false representations and omissions of material fact may also be inferred by Tilney's invocation of his Fifth Amendment rights.

- 14 -

## C.  Common law Fraud

To prevail on a cause of action for common law fraud under Texas law, a plaintiff must prove that the defendant (1) made a misstatement or omission (2) of material fact (3) with the intent to defraud (4) on which the plaintiff relied, and (5) which proximately caused the plaintiff injury. *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2002), *citing Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). *See also Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 104 (5th Cir. 1996)("The elements that are necessary to state a claim of common law fraud are basically identical [to those for statutory fraud].  The elements of a fraud are a material misrepresentation, which was false and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon and which caused injury.").  "[A] defendant who acts with knowledge that a result will follow is considered to intend the result." *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.*, 51 S.W.3d 573, 578-80 (Tex. 2001)(concluding that Texas jurisprudence is consistent with the standard of the *Restatement (Second) of Torts* § 531 (1977) that the fraudfeasor intend or have "reason to expect" that the third party will act in reliance on the misrepresentation).[10]

_____

[10] The complaint at ¶¶ 514 and 517 asserts that Merrill Lynch is liable for fraud based on its analyst reports, which contained false representations and omissions of material fact about Enron's financial condition and creditworthiness, which Merrill Lynch knew were false because its own transactions with Enron had substantial fraudulent impact on Enron's SEC-filed statements, and which Merrill Lynch knew would be widely disseminated by financial news media.  In addition Merrill Lynch intended that the

The Texas Supreme Court has recognized a cause of action for common law fraud when

misrepresentations on Enron's balance sheets, which it helped to create, would be targeted at Enron investors with the goal of inducing Plaintiffs and other investors to purchase Enron securities. Merrill Lynch's enthusiastic analyst reports, even up to the filing of Enron's bankruptcy, were also intended to induce investors to purchase Enron securities. The complaint asserts that Merrill Lynch's participation in the Nigerian Barge and Power Trade Transactions evidences Merrill Lynch's wrongful intent, as did its agreement with the DOJ dated September 17, 2003 at 2, 3, which stated,

> Merrill Lynch acknowledges that the Department has developed evidence during its investigation that one or more Merrill Lynch employees may have violated federal criminal law. Merrill Lynch accepts responsibility for the conduct of its employees giving rise to any violation in connection with the Year-End 1999 Transactions. . . .

> Merrill Lynch further agrees that it will not, thorough its attorneys, board of directors, agents, officers or employees make any public statement, in litigation or otherwise, contradicting Merrill Lynch's acceptance of responsibility set forth above. Any such contradictory statement by Merrill Lynch, its attorneys, board of directors, agents, officers or employees shall constitute a breach of this Agreement.

Plaintiffs claim they relied on Merrill Lynch's representations, especially the persistent "buy" recommendations repeated by financial information services, in deciding to purchase or hold their Enron securities rather than to sell them, as well as on the SEC-filed financial statements which Defendants knew were used by investors to make investment decisions. #46 at ¶ 518. Moreover, they argue that Merrill Lynch had a duty to disclose where it voluntarily disclosed some information but not the whole truth, where it made a representation and failed to disclose new information that made the earlier representation misleading or untrue, or where it made a partial disclosure and conveyed a false impression. *Id.* at ¶ 520. They claim justifiable reliance on the SEC-filed statements and the analyst commentary, reported in general-circulation financial publications, as well as the fact that Defendants helped Enron deceive the ratings agencies upon which Plaintiffs also relied.

> (a) a party conceals or fails to disclose a
> material fact within the knowledge of that
> party,
> (b) the party knows that the other party is
> ignorant of the fact and does not have an
> equal opportunity to discover the truth,
> (c) the party intends to induce the other
> party to take some action by concealing or
> failing to disclose the fact, and
> (d) the other party suffers injury as a result
> of acting without knowledge of the disclosed
> fact.

*Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). "Fraudulent concealment or non-disclosure is a subcategory of fraud that occurs when a party with a duty to disclose a material fact fails to disclose that fact." *GMAC Commercial Mortgage Corp. v. East Texas Holdings, Inc.*, 441 F. Supp.2d 801, 807 (E.D. Tex. 2006), *citing Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)("Reliance is an element of fraud. Fraud by non-disclosure is simply a subcategory of fraud because where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts [citations omitted]."), and *Bradford*, 48 S.W.3d at 754-55.

For fraud based on non-disclosure, the defendant must have a duty to disclose. When particular circumstances impose on a person a duty to speak, silence can constitute a false representation. *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. App.--Fort Worth 1998, pet. denied). An affirmative duty to disclose may arise in four circumstances: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a

representation and new information makes that earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.–Houston [14th Dist.] 1997, pet. denied); *Id. See also Union Pacific Resources Group, Inc. v. Rhone-Poulenc,* Inc., 247 F.3d 574, 586 (5th Cir. 2001); *GMAC Commercial*, 441 F. Supp.2d at 808.   A plaintiff must allege facts showing that a defendant had such a duty to disclose under Rule 9(b).   *Carroll*, 470 F.3d at 1174.   Where a duty to disclose exists, the elements of fraud by nondisclosure are "(1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact." *Celanese   Corp. v. Coastal   Water   Authority*, 475 F. Supp.2d 623, ____, 2007 WL 471160, *8 (S.D. Tex. Feb. 9, 2007)(applying Texas law), *citing Daugherty v. Jacobs*, 187 S.W.3d 607, 618 n.3 (Tex. App.--Houston [14th Dist.] 2006, no writ), and *Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas*, 516 S.W.2d 138, 142 (Tex. 1974)..

Texas also recognizes a common law fraud cause of action where the false representation was made with the intent of reaching and deceiving a third person and thereby causing that third party injury; privity is not required between the fraudfeasor and the person he is trying to influence.   Section 531

of the Restatement (Second) of Torts (1977) requires more than probability of reliance and more than an obvious risk that a misrepresentation might be repeated to the third party; the fraudfeasor must "have information that would lead a reasonable man to conclude there is *an especial likelihood* that it will reach those persons *and will influence their conduct.*" *Ernst & Young*, 51 S.W.3d at 581, *citing* § 531 cmt. d (1977).

Reliance is an element of common law fraud, regardless of whether the fraud is by affirmative misrepresentation or by nondisclosure. *Celanese Corp. v. Coastal Water Authority*, 475 F. Supp.2d 623, _____, 2007 WL 471160, *9 (S.D. Tex. Feb. 9, 2007)(applying Texas law). Because one must often determine whether particular circumstances impose a duty to disclose information where the claim is based on a failure to disclose and whether plaintiffs justifiably relied on a misrepresentation or nondisclosure, "[r]eliance is ordinarily a question of fact for the fact-finder" and "is not a proper matter for dismissal on the pleadings." *Id., citing Jones v. Ray Ins. Agency*, 59 S.W.3d 739, 754 (Tex. App.-Corpus Christi 2001, pet. denied, 92 S.W.3d 530 (Tex. 2002)), and *1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 30 (Tex. App.-Houston [14th Dist.], 2005, pet. denied)("In the context of common law fraud, courts have uniformly treated the issue of justifiable reliance as a question for the factfinder. . . . The question of justifiable reliance depends heavily on the relationship between the parties and their relative sophistication").

**D.  Conspiracy to Defraud**

- 19 -

The elements of a cause of action for civil conspiracy in Texas are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Juhl v. Airington*, 936 W.W.2d 640, 644 (Tex. 1990). The fourth element is sometimes phrased as a meeting of the minds" to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Transport Insurance Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995). The "gist" of a civil conspiracy" is the injury the conspirators intend to cause. Conspiracy is a derivative tort, because recovery is not based on the conspiracy, i.e., the agreement, but on the injury from the underlying tort, here allegedly fraud. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Thus to be liable for conspiracy, a defendant must also participate in the underlying fraud. *Id*. Furthermore, if a plaintiff cannot adequately allege with particularity or ultimately prove an element of the underlying fraud, the conspiracy claim also fails. *Hernandez v. Ciba-Geigy Corporation USA*, 200 F.R.D. 285, 292 (S.D. Tex. 2001); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 380 (5th Cir. 2004).

Typically a conspiracy is proved by circumstantial evidence. *Schlumberger*, 435 S.W.2d at 858, *citing Jernigan v. Wainer*, 12 Tex. 189 (1854). "Circumstantial evidence may be used to establish any material fact, but it must constitute more than mere suspicion." *Transport*, 898 S.W.2d at 278, *citing Browning - Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927-28 (Tex. 1993)("some

suspicion linked to other suspicion produces only more suspicion, which is not the same as evidence."); *Schlumberger*, 435 S.W.2d at 858 ("vital facts may not be proved by unreasonable inferences from other facts and circumstances"; any vital fact must be proved "by evidence amounting to something more than a mere scintilla"). The evidence can include acts by or statements of the alleged conspirators. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963)("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").[11]

-----

[11] The complaint at ¶¶ 529-30 charges that Defendants had an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means) in their participation with Enron in a scheme to mislead the investing public about Enron's financial condition, the object of which was to defraud investors, to keep Enron afloat, and to provide continuing financial benefits to Defendants in violation of state and federal securities laws and the Texas Penal Code. Their meeting of the minds was evidenced by their constructing and participating in transactions that permitted Enron to disseminate false financial information in its SEC filings in violation of securities laws and promulgating other information that deceived credit rating agencies and the investing public. *Id.* at ¶ 531. Merrill Lynch, Tilney, and Enron allegedly committed numerous overt acts in furtherance of the conspiracy, with Defendants' overt acts aiding Enron to achieve its goal, and Enron's fraudulent conduct is imputed to each co-conspirator. Moreover each Defendant knew that Enron's purpose in entering into the disputed transactions was manipulation of its reported financial position. Merrill Lynch's overt acts, with prior knowledge of the purpose of them, included its participation in the Nigerian Barge Transaction and in the Power Trades Transaction and in promoting and participating in LJM2. *Id.* at 535. Tilney's overt acts included approval of the two transactions with prior knowledge that they were improper and were devised solely to allow Enron to cook its books at year-end 1999. *Id.* at 537.

### III. Factual Allegations Against Merrill Lynch and Tilney

The complaint alleges that when Enron was unable to sell at a profit several power-generation barges located off the coast of Nigeria, Enron's Treasurer, Jeff McMahon, proposed to Merrill Lynch's relationship banker, Robert Furst, that Merrill Lynch "buy" an interest in the Nigerian Barge project by having a Merrill Lynch SPE (later dubbed "Ebarge") purchase stock in an Enron subsidiary for $28 million and in return receive certain future revenue from sales of electricity to Nigeria under a power purchase agreement.   #46 at ¶¶ 333-34.   Accompanied by an "Appropriation Request" explaining that Merrill Lynch would be assuming no risk because it would be relieved of the investment within six months by Enron,[12] a December 21, 1999 Merrill Lynch interoffice memorandum stated that Enron saw the transaction "as a bridge to permanent equity" and enumerated, as the terms of the short-term deal, that (1) Enron would book "$12MM in earnings," (2) Merrill Lynch's "hold would be for less than six months," and (3) Merrill Lynch would enjoy a 22.5% return.   *Id.* at ¶ 334. According to the complaint, the SEC determined that because Enron

---

[12] The Appropriation Request stated that "Enron has strongly requested ML to enter into this transaction" and that

> Enron will facilitate our exit from the transaction with third party investors.  Dan Bayly will have a conference call with senior management of Enron confirming this commitment to guaranty the ML takeout within six months. . . . Enron has paid ML approximately $40 million in fees in 1999 and is expected to do so again in 2000.

#46 at ¶ 346.

provided $21 million of the purchase price to the Merrill Lynch SPE through a loan that was non-recourse to Merrill Lynch, Merrill Lynch only had to provide $7 million, strictly as an accommodation to Enron, which a Merrill Lynch internal document described as a "relationship loan." *Id.* at ¶ 335. Furst then urged approval of the deal because "Enron was an important client, and because of the magnitude of financial benefits available to both Enron and Merrill Lynch." *Id.* at ¶ 381.

The complaint further points out that James Brown, a Merrill Lynch managing director, warned Merrill Lynch at the time that the deal could lead to "reputational risk, specifically aid[ing and]/abet[ting] Enron income manipulation." *Id.* at ¶¶ 341-42.

Meeting on December 22, 1999 regarding the proposed transaction, Merrill Lynch's Debt Markets Committee, in light of Brown's voiced concern, insisted that Enron guarantee that Merrill Lynch's participation would not exceed six months and let Enron know that Merrill Lynch expected future Enron business. *Id.* at ¶ 345.

The complaint further alleges that Tilney, the Managing Director of Global Energy and Power, Global Marks & Investment Banking for Merrill Lynch, and others at Merrill Lynch were sent a memorandum, dated December 21, 1999, seeking quick consideration and approval of the Nigerian Barge transaction with Enron by the Debt Markets Commitment Committee. *Id.* at 336. The memorandum emphasized, so Tilney knew, there would be no risk for Merrill Lynch because Fastow guaranteed that Merrill would be taken out of

the deal in six months and that it would receive $28 million in cash flow (¶ 336-37) for its short-term services.  The complaint alleges that Tilney "was a very strong supporter of the Nigerian Barge Transaction" according to sworn testimony of Merrill Lynch managing directors James Brown on April 28, 2003 and Jeffrey Kronthal on May 7, 2003 (¶ 339), that he "put on a lot of undue pressure to get deals closed–no matter what the legal issues or barriers were" (¶ 319), and that he "pushed for and strongly recommended approval" of the Nigerian Barge and Power Trades as "one of Enron's highest priorities" because "they would enable Enron to achieve 'off-balance sheet' treatment for certain assets."

The complaint further states that Tilney, along with Merrill Lynch's Davis and Daniel Bayly, received verbal confirmation from Fastow on December 22, 1999 that Enron would take Merrill Lynch out of the deal within six months and that they told Fastow that Merrill Lynch expected future Enron business as a reward #46 at ¶ 347.  Merrill Lynch drafted a letter agreement on December 23, 1999 which recited that Merrill Lynch's equity interest would "be subsequently sold to third party equity investors or purchased by Enron or an affiliate" and that Merrill Lynch, the "exclusive advisor" for the transaction, would receive "a yield of 15.00% per annum" on its investment."  The complaint asserts, "Thus, Merrill Lynch knew that the risk of ownership of the barges never passed from Enron and therefore also knew that Enron could not account for the transaction as a sale under GAAP rules."  *Id.* at ¶ 348.  The letter agreement that Merrill Lynch

and Enron actually entered into on December 29, 1999 eliminated
the specific yield figure to be paid to Merrill Lynch and the
promise to take Merrill Lynch out of the deal within six months
because their inclusion would have prevented Enron from accounting
for the transaction as a sale under GAAP rules and for properly
recognizing revenue from the transaction. *Id.* at ¶¶ 348-40. The
Nigerian Barge Transaction closed on December 29, 1999; it allowed
Enron to report about $12 million in earnings in the fourth
quarter of that year in its quarterly and annual financial
reports. *Id.* at ¶ 351.

Six months later, Merrill Lynch sent an email and was
drafting a letter on June 14, 2000 to remind Enron about the
guaranteed takeout, when Enron told Merrill Lynch that LJM2, an
Enron affiliate, would purchase Merrill Lynch's $7,525 equity
interest in the Nigerian Barge SPE because no third-party buyer
had been found for the barges. *Id.* at ¶¶ 352-55. That purchase
had been presented to the Merrill Lynch LJM2 limited partners, who
included Tilney, Bayly, Furst, and Brown, as early as March of
2000, so these Merrill Lynch employees knew or had reason to know
that Enron was proposing to have LJM2 purchase the barges from
Merrill Lynch; the Merrill Lynch LJM2 limited partners  also knew
from their arrangement with Enron that the purpose of the
transaction was to manipulate Enron's 1999 statements, but they
did not tell any non-Merrill Lynch limited partners. *Id.* at ¶
356. Thus the Merrill Lynch limited partners alone profited from
the transaction, while the other limited partners unknowingly
invested in what was an unprofitable deal for them. *Id.*  Merrill

Lynch gained a $525,000 premium on the transaction (a 15% interest rate, annually) and a $250,000 "advisor" fee, totaling an annual 22.14% return, as agreed beforehand, on its six-month, guaranteed $7 million "investment" in the Nigerian Barge Transaction.

Plaintiffs highlight the indictment and conviction of several Merrill Lynch executives[13] for criminal conduct in connection with the Nigerian Barge Transaction even though the convictions were overturned by the Fifth Circuit[14] on the counts of conspiracy and wire fraud based on the government's "honest services" theory of fraud.[15] *See, e.g.,* #46 at ¶¶ 358-69. *United States v. Brown, et al.*, CR NO. H-03-363 (S.D. Tex.), *aff'd in part, rev'd in part, and vacated in part*, 459 F.3d 509 (5th Cir. 2006), *petition for cert. filed*, 75 U.S.L.W. 3397 (Jan 16, 2007)(No. 06-975).[16] The government has since decided to retry the

---

[13] The four Merrill Lynch employees were Managing Directors Dan Bayly (head of Global Investment Banking division), James Brown (head of Merrill Lynch's Strategic Asset and Lease Finance Group), Robert Furst (relationship manager in the investment banking division), and William Fuhs (Vice President reporting to Brown). H-03-CR-363, #31.

[14] The complaint states that the reversal was based on the narrow theory of "honest services" pursued by the prosecutor. It quotes the Fifth Circuit: "This opinion should not be read to suggest that no dishonest, fraudulent, wrongful or criminal act occurred. We only hold that the alleged conduct is not a federal crime under the honest-services theory of fraud specifically. [emphasis in original]" 459 F.3d at 523.

[15] Counts against James Brown for perjury and obstruction of justice were not overturned and are on appeal to the Supreme Court.

[16] The Court points out that Tilney was not among those Merrill Lynch employees (James Brown, Daniel Bayly, Robert Fuhs, and Robert Furst) who were indicted, tried, and convicted in relation to the Nigerian Barge Transaction.

case under a different fraud theory. Meanwhile, the complaint asserts, Merrill Lynch, in an agreement with the Department of Justice dated September 17, 2003, admitted that it is liable for conspiracy with Enron to commit fraud for all its employees' misconduct during the Nigerian Barge Transaction and the Power Trades Transaction (discussed *infra*) and has accepted responsibility for any acts by its employees giving rise to an violation of federal criminal law, and would not make any public statements, in litigation or otherwise, that contradict its acceptance of responsibility. *Id.* at ¶¶ 369-71, 394.

According to the complaint, also in late 1999 Enron again approached Merrill Lynch with another "entirely risk-free" deal, the "Power Trades Transaction," that would artificially inflate Enron's reported income for that year by approximately $50 million. *Id.* at ¶ 375. "Because of the accounting trickery" that would be involved in reporting the transaction, Enron required Merrill Lynch to enter into a confidentiality agreement, executed on December 8, 1999 by Enron North American Corporation and Merrill Lynch Capital Markets, that barred Merrill Lynch from disclosing any information about the proposed electricity trade transactions. *Id.* at ¶ 376. Furthermore Enron offered Merrill Lynch $17 million as an incentive to participate in the deal. *Id.* at ¶ 377. Merrill Lynch's Dan Gordon, with the help of Furst and Tilney, then prepared a memorandum outlining the proposed deal, which involved two back-to-back options, and sent it to the Special Transactions Review Committee ("STRC") to explain the

deal.  *Id.* at ¶ 378.   The memorandum, which "highlighted the transaction's positive aspects," stated that Enron would sell to Merrill Lynch a physically-settled call option, while Merrill Lynch simultaneously would sell Enron a financially-settled call option, with the terms of both regarding quantity, pricing, market locations and terms nearly identical, in essence cancelling each other out.  *Id.*  No energy was actually ever exchanged under these contracts.  *Id.*  Gordon's memorandum characterized the options as "mirror image[s]" and observed, "the proposed transaction is 'back to back' and is therefore 'delta-neutral.'"  *Id.*  Thus Merrill Lynch knew that there was no commodity price risk and that the transactions were linked.  *Id.* at ¶ 379.

A  December  29,  1999  memorandum  states  that  the documentation is ready and that the controlling agreements "will 'cross-default' to one another.  As such, in the event that one trade 'dissolves' the other trade will also 'dissolve.'"  *Id.*  The memorandum further indicated that Merrill Lynch would be paid $17 million based partly on "the benefits enjoyed by ENRON as a result of the transaction."  *Id.* at ¶ 380.  A  complaint filed by the SEC alleged, "Enron was initially surprised regarding the size of the fee because the transaction posed little risk to Merrill Lynch, but  ultimately  agreed  to  pay  a  $17  million  fee  given  the importance of the transaction to its year-end earnings."  *Id.* at ¶ 386.[17]  That complaint further asserted that the STRC, when it

---

[17] The SEC complaint alleged that even though Merrill Lynch knew Enron would improperly account for the $50 million from the "sham energy trade," when considering whether to approve the Power Trades Transaction, a high level Merrill Lynch executive stated

reviewed the transaction, also knew that the fee "bore no relationship to any work or risk undertaken by Merrill." *Id.* at ¶ 386. Plaintiffs' complaint charges, "If the Power Trades were actual trades driven by market forces, the large discrepancy in option premiums (Enron was obligated to pay $17 million in excess of what it was scheduled to receive from Merrill Lynch) would not exist. The only purpose to this discrepancy was a way for Enron to compensate Merrill Lynch for participating in the transaction." *Id.* at ¶ 387.[18]

Furst and Tilney pushed for immediate approval of the transactions, emphasizing that they were among Enron's highest priorities, to allow Enron to achieve "off-balance sheet" treatment for certain assets and because Enron was an important client and the transaction would bring sizeable financial benefits to both participants. *Id.* at ¶ 381.

The STRC met twice on December 30, 1999. In the first meeting, concern was expressed about the propriety of Enron's planned accounting for the transactions and the effect they could have on Enron management compensation. *Id.* at ¶ 382. Realizing that the sole purpose of the transactions was to generate approximately $50 million in bogus income for Enron, and that the

_____

that Merrill Lynch had "17 million reasons to approve it." #46 at ¶ 393.

    [18] The complaint quotes Enron Bankruptcy Examiner Neal Batson, who found that Merrill Lynch "entered into two virtually offsetting electricity derivative transactions with Enron that Merrill Lynch knew Enron was using to achieve earnings targets at year-end 1999 and with respect to which Merrill Lynch believed Enron's accounting to be improper." #46 at ¶ 392.

Power Trades Transaction had no legitimate business purpose, the STRC rejected the deal. *Id.* at ¶ 383. After the first meeting, Furst and Tilney contacted Richard Causey for assurances that the proposed accounting treatment had actually been approved by Enron and Arthur Andersen. *Id.*

During the second meeting of the STRC that same day, Tilney and Furst informed the STRC that "Enron's *only* purpose for the [Power Trades] transaction was to achieve year-end earnings, a true cooking of the books-arrangement" (¶ 383).[19] Thus Merrill Lynch's management knew there was no legitimate business purpose behind the transactions. Moreover Causey confirmed that Enron would report $50-60 million as earnings on the transactions, that this amount was material to Enron, and that it would affect senior management bonuses. *Id.* at ¶ 383. Furthermore Causey objected to Merrill Lynch's speaking with Arthur Andersen directly about the Power Trades, so Merrill Lynch agreed instead to receive a letter from Enron stating that Arthur Andersen had approved Enron's intended accounting. *Id.* Causey signed a letter with such representations; it also stated that Merrill Lynch had not provided any accounting advice to Enron, nor had Enron relied on Merrill Lynch in any way to determine the appropriate market value of the power trades. *Id.* at ¶ 384. "For use as a future potential defense," the letter was preserved in Merrill Lynch's internal files with the statement, "Merrill Lynch did not Design or Contribute to the Accounting Components of the Proposed

---

[19] The complaint does not identify the source of this information.

Transaction." *Id.* at ¶ 385. On December 31, 1999, in time for Enron to report falsified earnings in its annual financial reports, Merrill Lynch closed the Power Trades Transaction with the knowledge that Enron's accounting of the trades would manipulate its year-end earnings. *Id.* at ¶¶ 385, 388.

In late May, 2000, according to the complaint, Enron requested that Merrill Lynch unwind the deal early and without receiving the promised $17 million fee. *Id.* at ¶ 389. In an email from Tilney to Dan Gordon, Tilney stated, "We were clearly helping them make earnings for the quarter and year-end (which had a great value in their stock price, not to mention personal compensation). What would you think was a fair number in the absence of relationship issues?" *Id.* at ¶ 389. The deal was unwound on June 30, 2000, with no energy ever having changed hands and with a payment of only $8.5 million to Merrill Lynch, half the amount originally agreed. *Id.* at ¶ 390.

The complaint asserts that in supporting and pushing for approval of both the Nigerian Barge Transaction and the Power Trades Transaction, Tilney "acted with reckless contempt for the law and the truth" because even prior "to approving the transactions, Tilney knew that Enron's accounting for the Nigerian Barge Transaction and the Power Trades Transaction would be both untruthful and, because they would be incorporated in SEC filings, illegal" (*Id.* at ¶ 492); that after Enron's collapse Tilney continued the coverup of the fraudulent nature of the transactions (¶ 452); that instead of "explaining away his and Merrill's" malfeasance to the Permanent Subcommittee on Investigations,

"Tilney instead invoked his Fifth Amendment right against self incrimination" (¶454); and that his and others' "failure to alert Plaintiffs and the investing public about the Enron misrepresentations Defendants helped make false . . . confirms . . . Merrill Lynch's aid to Enron's fraud and their willing, knowing, and purposeful participation in conspiracy with Enron to commit fraud" (¶ 456).

The complaint also conclusorily alleges that Tilney "had extremely close relationships with Enron executives" (later identified as Jeff McMahon and Andrew Fastow, and Fastow's wife) and that he "conspired with and aided Enron's fraud." *Id.* at ¶¶ 22, 316, 318.

The complaint claims that following the collapse of Enron, after a criminal investigation, the Enron Task Force of the Department of Justice determined that Merrill Lynch had violated federal criminal laws in the Nigerian Barge and Power Trades Transactions.  The complaint also asserts that the Securities and Exchange Commission's and the Department of Justice's investigations produced evidence that "establishes that Merrill Lynch conspired with Enron to cook its books and aid Enron in promulgating false financial statements." *Id.* at ¶¶ 325-26.  The complaint highlights, *id.* at ¶ 22, the fact that Tilney

> was fired by Merrill in September 2002 after he invoked his Fifth Amendment rights and refused to testify in an investigation into Enron's collapse being conducted jointly by the Securities and Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ").

Plaintiffs further claim that Tilney's invocation of the Fifth Amendment "creates an inference of Tilney's intentional wrongdoing." *Id.* at ¶ 491.

Regarding Merrill Lynch's equity analysts, the complaint asserts that Enron required its investment banks and their employees to be "Enron boosters." *Id.* at ¶ 396. Merrill Lynch accordingly "routinely and frequently produced and distributed glowing reports about Enron, about Enron's management and about Enron's prospects," indeed "even after Merrill knew that Enron was technically insolvent." *Id.* at ¶¶ 397, 405. As examples the complaint quotes from 2001 reports by Donato Eassey, Leo Kelser, and other Merrill Lynch analysts. *Id.* at ¶ 399-405. It also details the termination of analyst Jon Olson after Olson downgraded his rating of Enron stock from "buy" to "hold" on July 15, 1997, and Enron complained. *Id.* at ¶¶ 406-08, 411. His replacement, Donato Eassey, immediately upgraded Enron's equity rating on November 16, 1998. *Id.* at ¶ 409. According to a January 18, 1999 email from Merrill Lynch's Investment Banking Division to Merrill Lynch's president, Merrill Lynch was later rewarded with "two significant mandates by Enron. . . . Total fees to Merrill Lynch for these two transactions alone should be $40-50 million." *Id.* at ¶ 410.[20]

---

[20] Plaintiffs assert that in 2002, too late for Enron investors, New York Attorney General Eliot Spitzer investigated Merrill Lynch to determine if its investment advice was tainted by conflicts of interest. As a result Merrill Lynch agreed to pay a $100 million penalty and to effectuate reforms, including "(a) severing links between compensation for analysts and investment bankers; (b) prohibiting investment banking input into analysts' compensation; (c) creation of a new investment review committee

As a final basis for Merrill Lynch's alleged liability, Plaintiffs assert that Merrill Lynch, Enron and others conspired to use LJM2, which was created in late 1992, "which devised and participated in a wide variety of investments and convoluted transactions which had the effect of transferring Enron wealth from Enron's investors to Enron CFO Andrew Fastow and to LJM2's limited partners," and which was used to hide Enron's liabilities and to perpetuate the Ponzi scheme.[21]   #46 at ¶ 417.   Although

---

responsible for approving research recommendations with strict standards and independence from investment banking; (d) disclosure in Merrill's research reports whether it has received or is entitled to receive any compensation from a covered company; and (e) establishing a monitor, approved by the New York Attorney General, to monitor compliance with the agreement.  *Id.* at ¶¶ 412-14.

[21] The complaint, at ¶¶ 421-22, asserts,

> LJM2 was used to complete a number of year-end deals to boost Enron's reported profits. Enron "sold" a number of "assets"–assets that Enron had been unable to sell to legitimate, bona fide buyers–to the LJM2 entity.  This mixed bag of essentially unmarketable assets included, among other things, majority interests in a Polish power plant and an interest in a Gulf of Mexico natural gas system.  Enron reported a profit on the sales of assets to LJM2,  Later, Enron often repurchased the assets.
> Enron used LJM2 to enter into transactions that allowed Enron to inflate earnings and reduce debt, with transactions typically taking place just before year end to bolster Enron's reported financial condition.

The complaint cites Andrew Fastow's plea agreement to show how LJM2 was used to falsify Enron's financial results and the July 14, 2005 Cooperation Agreement with the Department of Justice signed by Christopher Calger, former vice president in charge of West Power Organization Group of Enron North American, to claim that LJM2 was improperly used to avoid disclosures that would lead to accounting treatment that Enron wished to preclude.  *Id.* at ¶ 424, 426-27.

knowing from the start that Fastow's dual roles, as Enron's Chief Financial Officer, charged with protecting shareholders, and as a controller and decision-maker of LJM2, constituted an improper and obvious conflict of interest, Merrill Lynch proceeded with the placement of loans to LJM2 that generated substantial fees and allowed its executives ("select investors") to invest in the SPE with unusually high rates of return. *Id.* at ¶¶ 419-20, 436. Specifically, Merrill Lynch established ML/LJM2, an investment vehicle through which its executives committed to invest about $16.6 million; Tilney committed $750,000. *Id.* at ¶ 436-39. Enron also used LJM2 to take Merrill Lynch out of the Nigerian Barge transaction. *Id.* at ¶ 428. Collecting substantial fees for its services, Merrill Lynch was instrumental in helping Fastow set up LJM2 and was the primary placement agent for seeking capital commitments for LJM2, for which Merrill Lynch was paid over $3 million. *Id.* at ¶ 430. Merrill Lynch never admitted publicly that the Nigerian Barge Transaction, the Power Trades Transaction, and LJM2 were used to promulgate false information about Enron's finances or that Merrill Lynch's recommendations to investors to purchase or hold Enron securities were based on false information.

### IV. Briefing on Motions to Dismiss

### A. Tilney's Motion to Dismiss (#47)

Tilney seeks dismissal of the First Amended Complaint (1) to the extent that it includes claims for damages in connection with plaintiffs' "holder claims"[22]; (2) to the extent

---

[22] The "holder claims" are claims for the diminution in value of Enron securities that plaintiffs neither purchased nor sold

that it includes conspiracy and statutory and common law fraud claims for failure to state a claim and failure to allege fraud with particularity; and (3) because Plaintiffs' Texas Securities Act claims are time-barred by the statute of limitations.  Tilney provides no authority for his arguments nor supporting facts, but "adopts and incorporates herein the points and authorities set forth in support of the motion to dismiss" filed by the other Defendants.  #47 at 2.

## B.  Merrill Lynch's Partial Motion to Dismiss (#48)

Merrill Lynch repeats Tilney's first two grounds for dismissal, but cites authority for them and analyzes the law as applied to the facts alleged in the First Amended Complaint.

Merrill Lynch maintains that "holder" claims should be dismissed as matter of law because neither Texas statutory nor common law recognizes a cause of action based on them.  By definition, holder claims do not arise from the purchases or sales of securities during the period of alleged wrongdoing and are therefore outside the scope of Section 27.01(a)(1)(A)(B) of the Texas and Commerce Business Code (2005)(requiring that an allegedly false representation of a material fact have been "made to a person for the purpose of inducing that person to enter into

---

during the period of alleged wrongdoing, 1997-2001.  As noted earlier, "Holder" Plaintiffs Farm Family Life Insurance Company and Farm Family Casualty Insurance Company purchased Enron preferred stock in 1993; Farm Family Life Insurance additionally purchased an Enron bond in 1992; and National Western Life Insurance Company bought Enron bonds in 1992 and 1993.  These entities continued to hold the securities through the relevant period.  *See* First Amended Complaint (#46) at ¶¶ 37, 457, 459.

a contract; and relied on by that person in entering into a contract"), and they are outside the scope of Article 581-33(A)(2) of the TSA (2005) (requiring that a buyer allege that it purchased materials from the person against whom it alleges liability for an untrue statement or omission of a material fact). *See Barsky v. Arthur Andersen, LLP, et al.*, No. Civ. A. H-02-1922, 2002 WL 32856818, *2 n.3 (S.D. Tex. Aug. 16, 2002). Other jurisdictions agree and have rejected holder claims under state or federal law or severely restricted them for significant policy reasons. *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734-35 (1975)(limited private cause of action under § 10(b) and Rule 10b-5 to purchasers and sellers of securities in part because one "who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell[] is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis"); *Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1018 (D. Conn. 1994)(under Connecticut law, claims for damages based on the plaintiff's failure to sell or hedge their stock "too speculative to be actionable"), *aff'd*, 31 F.3d 66 (2d Cir. 1994); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 461, 489 (E.D. Va. 2002)("the claims of the retaining shareholders here fail adequately to plead causation between the misrepresentation and the harm"). Courts that have allowed holder claims have required the plaintiffs to meet heightened pleading standards and, in some cases, to prove that plaintiffs held onto securities as a result

of information that they received through direct communications with the defendants.  *See, e.g., Rogers v. Cisco Sys., Inc.*, 268 F. Supp.2d 1305 (N.D. Fla. 2003); *Small v. Fritz Cos., Inc.*, 65 P.3d 1255 (Cal. 2003).

Moreover, argues Merrill Lynch, the holder claims are derivative of a harm suffered directly by Enron, which filed for bankruptcy on December 2, 2001, and therefore are causes of action that belong to Enron's bankruptcy estate and that cannot be brought directly by Plaintiffs.  An action for damages based on a diminution in the value of a company's securities is a derivative claim that cannot be brought directly by shareholders.  *Smith v. Waste Management, Inc.*, 407 F.3d 381, 385 (5th Cir. 2005)("when a corporation, through its officers, misstates its financial condition, thereby causing a decline in the company's share price when the truth is revealed, the corporation itself has been injured"); *Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988)("Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder"); *Loewen v. Galligan*, 130 Or. App. 222, 228 (Or. App. 1994)(an individual may not bring a direct claim against directors and officers where the only injury alleged is a diminution in the value of the company's securities).

Once a bankruptcy petition has been filed, derivative claims become property of the debtor's estate.  11 U.S.C. § 541(a)(1)(defining property of the estate as "all legal and equitable interests of the debtor in property."); *Schertz-Cibolo-*

*Universal City v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1283-84 (5th Cir. 1994)(when a corporation is in bankruptcy, a cause of action for direct damages to company is considered property of estate as a "legal and equitable interest of debtor" and cannot be pursued by individual plaintiffs); *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253-54 (5th Cir. 1986)("If an action belongs to a corporation under Texas law, then the action becomes the property of the estate once the bankruptcy petition is filed.").[23]

The statutory and common law fraud claims must be dismissed for lack of factual specificity under Rule 9(b), insists Merrill Lynch.  The First Amended Complaint (#46) fails to allege specific misrepresentations or material omissions, nor does it plead adequately Plaintiffs' reliance on such.  Merrill Lynch insists that the First Amended Complaint, although filed long after the close of discovery and with the benefit of it, makes only conclusory allegations that Merrill Lynch made misrepresentations about Enron's financial condition on which Plaintiffs justifiably relied.  They merely refer generally to Enron's financial statements filed with the SEC, "upbeat analyst reports" from Merrill Lynch that portrayed "Enron as a strong,

---

[23] Because this Court has recently addressed the same legal issues regarding holder claims under Texas and Fifth Circuit law as a matter of law in its Opinion and Order of Reconsideration, G-02-299, *American National Insurance Co., et. al. v. J.P. Morgan Chase & Co.*, instrument #66, entered April 19, 2007, the Court hereby incorporates that Opinion and Order here and does not summarize all the arguments made on this issue, but  applies that law to the facts alleged in the First Amended Complaint.

well-managed company with excellent growth prospects" or recommendations "touting" Enron that were "disseminated through various media" to plaintiffs and on which they justifiably relied. Not a single instance of a misrepresentation by Merrill Lynch to one of the Plaintiffs is identified, nor have Plaintiffs adequately pled justifiable reliance with specific facts.

As for Plaintiffs' conspiracy claims, Merrill Lynch points out, "Civil conspiracy is a derivative tort and a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *RTLC AG Products, Inc. v. Treatment Equipment Co.*, 195 S.W.3d 824, 833 (Tex. App. 2006). "The elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Id., citing Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex. 2005). The Fifth Circuit has held that civil conspiracy to commit a tort sounds in fraud and is governed by Rule 9(b)'s requirement that it be pled with particularity. *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 960 (5th Cir. 1994). Merrill Lynch contends that the claim has no factual support pled with the particularity required by Rule 9(b), but only boilerplate and conclusory statements that Defendants and Enron had an agreement to accomplish an unlawful common plan to defraud the investing public generally and Plaintiffs specifically. There are no allegations that representatives of Enron met with Merrill Lynch

representatives and reached a "meeting of the minds" that they would work together on the various fraudulent transactions alleged.

**C.  Plaintiffs' Response in Opposition (#51)**

**1.  Tilney's Individual Arguments for Dismissal**

Relating to Tilney's bare-bones assertion that the TSA claims are barred by the statute of limitations, Plaintiffs complain it is a conclusory statement made without citation to authority or provision of any factual support.  First of all, the "holders," i.e., National Western, Farm Family Life Insurance Company, and Farm Family Casualty Insurance Company, do not assert any TSA claims against Merrill Lynch.[24]   Furthermore, under the TSA's general limitations period and period of repose, claims must be brought the earlier of (a) more than three years after the discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence or (b) within five years after the sale.  Tex. Rev. Civ. Stat. art. 581-33H(2).  Plaintiffs insist that the limitations began to run after December 2, 2001, when Enron filed for bankruptcy.  Plaintiffs' suit against Tilney was filed on October 11, 2002, less than one year later.  They point out that Tilney, who, as a Rule 12(b)(6) movant, bears the  burden of demonstrating that Plaintiffs can prove no set of facts to support their claims and entitle them to relief, has not stated, no less demonstrated, that Plaintiffs

---

[24] Moreover, in their Sur-reply (#58 at 3 n.4, Plaintiffs state that "[t]he common law 'holder' claims are the only claims based upon securities purchased prior to September 11, 1997."

discovered or should have discovered their claims on any earlier date.  Moreover, a limitations bar is a fact question not appropriate for resolution on a motion to dismiss.  *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998).  If a defendant moves for summary judgment on the affirmative defense of statute of limitations, he has the burden of conclusively establishing that defense, i.e., when the cause of action accrued and if the discovery rule applies, negating it by demonstrating there is no genuine issue of material fact as to when the plaintiff discovered the injury or in the exercise of reasonable diligence should have discovered it.  *Id.; KPMG Peat Marwick v. Harrison County Housing Finance Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).[25]

---

[25] This Court agrees.  Texas Civil Procedure Rule 94 specifies that statute of limitations is an affirmative defense.  *Id.* ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of limitations . . . .").  Fed. R. Civ. P. 8(c) lists the statute of limitations as an affirmative defense, which a defendant must affirmatively plead in response to a complaint.  *See also* 50 Tex. Jur. 3d Limitations of Actions § 163 (West Data based updated Feb. 2007):

> Except where the complaint on its fact shows that the action is barred by limitations, the statute of limitations constitutes a defense that must be affirmatively pleaded under the applicable requirements of the Rules of Civil Procedure. . . . . Mere general denial, then, will not place in issue the affirmative defense of limitations, which must be specially pleaded, or risk waiver of the defense, regardless of the proof in support of the statute not asserted.

*See also Nelson v. Chaney*, 193 S.W.3d 161, 165 (Tex. App.–Houston [1st Dist.] 2006)("A defendant seeking summary judgment must as a matter of law . . . plead and prove each element of an affirmative defense.").
    The statute of limitations for fraud under Texas law is four years.  *Prieto v. John Hancock Mutual Life Ins. Co.*, 132 F. Supp.2d 506, 512 (N.D. Tex. 2001).  "When a defendant has

Plaintiffs also challenge as meritless Tilney's objection that they have failed to plead fraud with particularity against him because they have not alleged any specific misrepresentations made by him. Instead they argue that Tilney has continually asserted his Fifth Amendment rights in refusing to answer questions, to testify before the Securities and Exchange Commission and the Department of Justice, or to participate in discovery.[26] Plaintiffs state that they only allege aider and abettor and conspiracy claims against Tilney. Moreover Plaintiffs maintain that in a civil action a defendant's refusal to testify is a basis for drawing adverse inferences against him at trial. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)(the "prevailing rule" is "that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"). Indeed, his refusal to testify could be the basis for granting a summary judgment against him. *U.S. v. Two Parcels of Real Prop. Located in Russell County*, 92 F.3d 1123, 1128 (11th Cir. 1996).

---

fraudulently concealed the facts forming the basis of the plaintiff's claims, limitations does not begin to run until the claimant, using reasonable diligence, discovered or should have discovered the injury." *KPMG Peat Marwick v. Harrison County Housing Financial Corp.*, 988 S.S.2d 746, 750 (Tex. 1999).

[26] Plaintiffs state that Tilney's deposition was conducted on August 17-18, 2006 in *Newby*. They represent that Tilney answered some questions but continued to assert his Fifth Amendment privilege and refused to answer any questions about the Nigerian Barge transaction, in  which he was involved.

They urge the Court to deny his motion to dismiss under Rule 9(b) because of his assertion of his Fifth Amendment rights.[27]

Plaintiffs insist they have allegations in the complaint specifying Merrill Lynch's misrepresentations, both affirmative and by omission, upon which Plaintiffs relied. Merrill Lynch allegedly failed to disclose the truth while its analysts (agents of Merrill Lynch) issued a steady stream of reports and recommendations containing information from Enron's financial statements that Merrill Lynch knew to be false. A duty to disclose is not limited to confidential or fiduciary relationships; when a person voluntarily discloses information, he has a duty to disclose the whole truth, to disclose new information when he is aware that it is necessary to prevent the earlier representation from being misleading or untrue, or when he makes a partial disclosure and conveys a false impression. Merrill Lynch had such a duty here under the facts alleged (Merrill Lynch knew the Nigerian Barge Transaction, Power Trades Transaction, and LJM2 were to help Enron "cook its books," the major impact they had on Enron's year-end financial reports, Donato Eassey's use of falsified financial data, the firing of Olson for honestly downgrading Enron stock, indeed its manipulation of the analysts making such reports). In addition to its active manipulation, Merrill Lynch allegedly knew that its agents/analysts were issuing affirmative misrepresentations in its

---

[27] Plaintiffs also state that if the Court does not deny the motions to dismiss, the recent deposition of Andrew Fastow contains previously undiscoverable evidence supporting their claims against Tilney and they request leave to replead.

name, based on false financial data that it helped to create, but remained silent.  *Quaak*, 445 F. Supp.2d at 141 (where the analyst was "kept in the dark" about the fraudulent data the defendant helped to create, the defendant should not be shielded from liability).

Plaintiffs maintain that they have adequately alleged Merrill Lynch's knowledge of Enron's true financial condition and fraudulent financial statements and Merrill Lynch's participation in making the financial statements false.

Plaintiffs also insist that they have adequately pled against Tilney causes of action for conspiracy to commit fraud and for a secondary violation of § 27.01(d) of the Texas Business & Commerce Code and of section 33F of the TSA, based upon Enron's misrepresentations to Plaintiffs in Enron's financial statements and affirmative misrepresentations and omissions relied upon by Plaintiffs.  First Amended Complaint, #46 at 9 ¶ 37, at 105 ¶ 460, at 14-19 ¶¶ 57-76.[28]   They also claim they have adequately pled facts from which a person could at least infer a conspiracy with Enron and violation of § 27.01(d), noting allegations that Tilney pushed for Merrill Lynch's approval of the Nigerian Barge

_____

[28] The Court notes that the last citation to paragraphs in the complaint is to plea agreements by various Enron officials (including Richard Causey, Andrew Fastow, Ben Glisan, Mark Koenig, Kevin P. Hannon, Timothy Despain, and Michael Kopper) judicially admitting to the existence of  misrepresentations in the financial statements and to participation in fraudulent transactions that led to the fraudulent accounting that made the financial statements unreliable indicators of Enron's actual financial condition, but it does not specifically identify any of the misleading statements or omissions upon which Plaintiffs claim they relied in investing or holding their securities.

transaction, knew about the verbal assurances from Andrew Fastow that resulted in the fraudulent accounting for the transaction, and urged Merrill Lynch to participate in the Power Trades Transaction. *Id.* at ¶¶ 319, 336, 378, 339, 347-56, 389.

## 2.  Joint Claims in Motions to Dismiss

Plaintiffs argue that where fraud claims are based upon a civil conspiracy, each co-conspirator is liable for acts in furtherance of the conspiracy committed by any of the conspirators. *Akin v. Dahl*, 661 S.W. 2d 917, 921-22 (Tex. 1962). Thus they conclude the allegations of wrongful misrepresentations are sufficient.   Similarly, Section 27.01(d) provides that a person commits the same fraud as the person making the misrepresentation when the person has actual awareness of the falsity of the misrepresentation made by the other person, fails to disclose that falsity to the defrauded person, and benefits from that misrepresentation.   Section 27.01(d) also provides, "Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness."   Plaintiffs assert that Defendants had actual awareness of the falsity of Enron's representations in its financial statements filed with the SEC.   Plaintiffs have made allegations and quoted from sworn statements of Enron officers (Richard Causey, Andrew Fastow, Ben Glisan, Mark Koenig, Kevin P. Hannon, Timothy Despain, and Michael Kopper) who stated that Enron's financial results were manipulated and the SEC financial statements were false and misleading.   For

instance, Richard Causey, Enron's Chief Accounting Officer from 1998 until Enron filed for bankruptcy, admitted in a sworn Plea Agreement that "Enron knowingly and purposely made false and misleading statements in Securities and Exchange Commission filings and other public statements."   In other words they indicated who (Causey), did what (falsified Enron's financial statements), when (at the time the 10Qs and 10Ks were prepared and filed) and where (at the SEC).   They also alleged facts showing how Merrill Lynch, through the Nigerian Barge Transaction and the Power Trades Transaction, helped Enron to manipulate its financial results to present a false picture of its financial health in annual reports and in financial statements filed with the SEC. Thus, insist Plaintiffs, they have adequately pled Enron's affirmative misrepresentations and misrepresentations by omission that support its conspiracy and Section 27.01(d) causes of action against Merrill Lynch and Tilney.

Plaintiffs further maintain they have adequately pled a simple fraud claim based on the same representations, and they have, contrary to Defendants' charge, cited false statements from analysts' reports and groundless "buy" recommendations based on them.   They have named Merrill Lynch analysts (e.g., Donato Eassey, ¶¶ 399-402, 409; Leo J. Kesler (#403), and M. Shawn Foley (¶404)), stated that they prepared the reports in which the misrepresentations were found, identified the dates of the reports (when the misrepresentations were made and disseminated to Plaintiffs and others), and described the misrepresentations, including quotations.   Defendants knew the financial statements

were false because they helped make them false.  ¶ 332-94.  While the analysts were reporting that Enron was a financially strong and creditworthy enterprise, the complaint alleges they were working to reduce their own exposure to Enron credit risk.

Plaintiffs claim they have adequately pled reliance on misrepresentations or omissions by any of the co-conspirators in furtherance of the conspiracy.  They insist that Defendants "cannot legitimately argue that Plaintiffs did not rely, or were unreasonable in relying, upon Enron's financial statements." *See, e.g., Britt v. Cyril Bath Co.*, 417 F.2d 433, 436 (6th Cir. 1969)("It is reasonable to assume that investors may very well rely on the material contained in false corporate financial statements which have been disseminated in the market place . . . ."); *In re Arnes Dept. Stores, Inc.*, 991 F.2d 953, 967 (2d Cir. 1993)(same); *Rifkin v. Crow*, 574 F.2d 256, 260 (5th Cir. 1978)(panel found that if accepted by the trier of fact, plaintiff's testimony that "a buyer of a security has a right to rely on the fact that the stock value bears some reasonable relationship to the financial statements circulated in the investment market" would satisfy reliance and support recovery). The analysts' recommendations were always positive, never downgraded, except for that by John Olson, who was terminated shortly thereafter.

Plaintiffs point out that under Texas law "a fraud cause of action exists where the false representation was made with the intent of reaching and deceiving a third person and thereby caused that third party injury; privity is not required between the

fraudfeasor and the person he is trying to influence to establish
a fraud claim." *In re Enron Corp. Sec. Litig.*, 388 F. Supp.2d
780, 784 (S.D. Tex. 2005), *citing Ernst & Young, L.L.P. v. Pacific
Mut. Life Ins. Co.*, 511 S.W.3d 573, 578-80 (Tex. 2001). Similarly
reliance may be indirect:

> The maker of a fraudulent misrepresentation is
> subject to liability for pecuniary loss to
> another who acts in justifiable reliance upon
> it if the misrepresentation, although not made
> directly to the other, is made to a third
> person and the maker intends or has reason to
> expect that its terms will be repeated or its
> substance communicated to the other, and that
> it will influence his conduct in the
> transaction or type of transaction involved.

*Hawkins v. Upjohn Co.*, 890 F. Supp. 609, 612 (E.D. Tex. 1994).
*citing* the Restatement (Second) of Tort § 533. Defendants do not
dispute that the analysts' reports were disseminated to Plaintiffs
and others in the "investment community," nor that they had reason
to expect that the reports would be considered by such investors.
Plaintiffs have also alleged that the analysts' reports were part
of the total mix of information upon which Plaintiffs based their
investment decisions. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th
Cir. 1994)("The appropriate inquiry is whether, under all the
circumstances, the omitted fact or the prediction without a
reasonable basis 'is one [that] a reasonable investor would
consider significant in [making] the decision to invest, such that
it alters the total mix of information available about the
proposed investment.'").

In sum, assert Plaintiffs, the Merrill Lynch analysts'
reports contained affirmative misrepresentations and

misrepresentations by omission and provided fraudulent "buy recommendations" based upon Enron's falsified SEC-filed financial statements. Merrill Lynch knew that Enron's financial reports, quoted in the analysts' reports, were false and misleading, and thus the recommendations were false and misleading. Merrill Lynch also knew that the analysts' reports omitted adverse information about Enron. Merrill Lynch furthermore knew the reports would be disseminated to the investing public, including Plaintiffs, as part of their scheme with Enron to help Enron cook its books. Plaintiffs have asserted that Plaintiffs considered these misrepresentations in their investment decisions. Any challenge by Defendants to the reasonableness of their reliance raises a fact issue that cannot be resolved on a motion to dismiss.

As for the conspiracy allegations, Plaintiffs insist they have adequately pled the cause of action even though Defendants maintain they have failed to allege facts showing an agreement to accomplish the alleged unlawful plan to defraud the investing public generally and Plaintiffs specifically. It is well established that an agreement may be informal and tacit, with proof of a civil conspiracy established by circumstantial evidence. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963)("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").

Plaintiffs argue that Merrill Lynch's agreement to participate in a conspiracy with Enron is illustrated by its conduct in executing the Nigerian Barge Transaction and the Power Trades Transaction.  In a settlement with the SEC in an enforcement action, Merrill Lynch accepted responsibility for the conduct of its employees that "may have violated federal criminal law" relating to these two transactions.  #46 at ¶¶ 369-71.  The complaint alleges that Merrill Lynch entered into oral side agreements that guaranteed it would take no risks and would make huge profits in a short time on these deals, for the sole purpose of helping Enron manipulate its 1999 year-end financial results. *Id.* at ¶¶ 332-95.  The last-minute transaction, which closed on December 29, 1999, allowed Enron to record approximately $12 million in earnings in its 1999 fourth quarter and annual financial reports.  *Id.* at ¶ 351.  Merrill Lynch received a pre-arranged $525,000 premium (15% annual interest rate) and a $250,000 "advisor" fee (22.14% rate of return) from Enron for its six-month guaranteed $7 million investment in the transaction. *Id.* at ¶ 357.  The complaint similarly asserts that the year-end 1999 Power Trades were risk-free for Merrill Lynch, that they artificially inflated Enron's 1999 reported income by $50 million, and that Merrill Lynch was paid a fee of $17 million, although it alleges this time that Arthur Andersen was aware of and knowingly participated in the fraud.  *Id.* at ¶¶ 375-95.  It further alleges that not only did Merrill Lynch aid Enron in concocting deceptive financial statements, but it also disseminated knowingly false, upbeat analyst reports about Enron.  *Id.* at 75 ¶ 331, ¶¶ 396-415.

As support for their claims, Plaintiffs point to the criminal trial of Merrill Lynch employees relating to the Nigerian Barge Transaction, in which the jury found beyond a reasonable doubt from the evidence that Merrill Lynch executives James Brown, Daniel Bayly, and Robert Furst conspired with Enron to knowingly and willingly commit fraud on the investing public. *Id.* at ¶¶ 322, 361, 366.[29]

Plaintiffs insist that the question whether the relationship between parties constitutes a conspiracy is usually a question of fact for the jury. *See, e.g., St. Gelais v. Jackson*, 769 S.W.2d 249, 257 (Tex. Civ. App.--Houston [14th Dist.] 1998, no pet.)(the court affirmed the jury finding of a civil conspiracy and found "The evidence of the interrelationships between the various defendants was sufficient to support the jury's belief that . . . the . . . defendants were acting in concert to defraud plaintiffs throughout the transactions in question."); *Ameristar Jet Charter, Inc. v. Signal Composites,*

---

[29] According to Plaintiffs and the First Amended Complaint, even though the convictions were overturned based on the reach of the government's "honest services" theory, the jury findings based on evidence presented at trial are relevant here. The jury found that Merrill Lynch executives agreed to buy the barges only because they knew that the purchase was not real. #46 at ¶ 361, citing ¶ 13. The jury also found that Enron promised to return Merrill Lynch's investment plus an agreed-upon profit of approximately 22% within six months when the barges would be sold to another party. ¶ 362. The complaint also argues that there is evidence that proves the purpose of the transaction in which Enron conspired with Merrill Lynch, was accounting fraud: Arthur Andersen accountant Debra Cash testified during her deposition that Arthur Andersen was misled about the nature of the transaction because Enron and Merrill Lynch did not disclose the oral side agreements. ¶ 368. Thus, argue Plaintiffs, their complaint should not be dismissed before they are allowed to present evidence.

*Inc.*, No. 398CV1360M, 2001 WL 1172184, *7 (N.D. Tex. Sept. 7, 2001)(jury could reasonably infer an agreement to defraud based upon defendants' involvement with the primary tort feasor).

**D. Defendants' Replies**

**1. Tilney's Reply (#57)**

Incorporating Merrill Lynch's Reply, discussed *infra*, Tilney conclusorily asserts that to the extent that Plaintiffs' claims fall outside the three year/five year limitations/repose period of the TSA, specifically Plaintiffs' claims arising before September 11, 1997 (five years before the filing of the first complaint in this action), they should be dismissed as time-barred. He also complains that the First Amended Complaint does not allege any of the dates on which Plaintiffs purchased the securities in dispute.

As for the fraud claims and Tilney's assertion of his Fifth Amendment rights, Tilney objects that a motion to dismiss turns on the sufficiency of a plaintiff's complaint, not on the evidentiary significance of a defendant's assertion of his constitutional rights. Plaintiffs have not cited any authority for the argument that a defendant's invocation of the Fifth Amendment can save an inadequately pled complaint challenged by a Rule 12(b)(6) motion to dismiss; instead they cite cases in other procedural postures, such as *Baxter*, 425 U.S. at 318, where evidence was being presented to the trier of fact, and which do not relate to the question of stating a claim at the outset of litigation. Tilney points out that the trier of fact is not required to draw an adverse inference after the defendant asserts

his Fifth Amendment privilege, and that before it can, Plaintiffs must establish a *prima facie* case for each of their claims. *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993)("The inference is permissible, but not required."); 8 Wright, Miller, and Marcus, *Federal Practice & Proc.* § 2018 n.63 (3d ed. 2004). Moreover because Tilney has not yet filed an answer raising the issue, the argument is premature. Even if Tilney had done so, he contends that Plaintiffs would not be entitled to a judgment against him. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390-92 (7th Cir. 1995)(recognizing the well established rule that it is permissible to draw an adverse inference against a party in a civil proceeding who asserts the Fifth Amendment and remains silent, but concluding that a party moving for summary judgment against that defendant must introduce evidence that the elements of the case exist and cannot rely solely on a negative inference, and the court must examine the other evidence in a "more than perfunctory" way; a judgment may not be based automatically or solely on Fifth Amendment silence), *relying on Baxter*, 425 U.S. at 318.[30]

---

[30] In *LaSalle* the Seventh Circuit noted that the Supreme Court has held that the Fifth Amendment not only prohibits an individual from being compelled to answer official questions in a civil or criminal proceeding, whether formal or informal, that might incriminate him in later proceedings, but it also "prohibited practices that are coercive in that they make the exercise of the privilege 'costly.'" 54 F.3d at 389, *citing Baxter*, 425 U.S. at 316 (*citing Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)), and *Spevack v. Klein*, 385 U.S. 511, 515 (1967). It concluded that "the drawing of an adverse inference from Fifth Amendment silence" in a civil case does not "impose an unconstitutional cost on the exercise of the privilege" if other incriminating evidence is presented. *Id.* at 389-90. It summarized, *id.* at 390,

Tilney also claims that Plaintiffs merely allege misrepresentations by Enron and they connect Tilney to Enron through conclusory assertions of his position at Merrill Lynch and his relationship with Andrew Fastow.  Such allegations against Enron as well as Tilney do not satisfy the requirement for pleading fraud with particularity nor justifiable reliance.  Plaintiffs have not charged Tilney with making any intentional misrepresentations to any of them, no less shown that they justifiably relied on such.  He also argues that the First Amended Complaint fails to allege adequately that Tilney was aware of any fraud committed by Enron, or the Tilney had a duty to disclose information to Plaintiffs.  Guilt-by-association based on a

---

Thus, although "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them" . . . an analysis of that evidence is nonetheless required.  Silence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden.

*Baxter* recognized "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  425 U.S. at 318.

The Fifth Circuit has ruled that even though the Fifth Amendment does not prohibit adverse inferences against parties to a civil action when they refuse to testify in response to probative evidence offered against them, the district court has wide discretion under Fed. R. of Evid. 403 in deciding whether to exclude an adverse inference if the probative value of the inference is substantially outweighed by the danger of unfair prejudice.  *Farace v. Independent Fire Ins. Co.*, 699 F.2d 204 (5th Cir. 1983); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 673-74 (5th Cir. 1999).

personal friendship of the Tilneys with the Fastows will not support a fraud cause of action.[31]


## 2.  Merrill Lynch's Reply (#56)

Merrill Lynch reiterates its arguments for partial dismissal on the grounds that (1) Plaintiffs' "holder" claims are not cognizable under Texas law and, regardless, are derivative claims that accrue to the debtor's estate; (2) the First Amended Complaint's statutory and common law fraud and conspiracy to defraud claims fail to satisfy Rule 9(b)'s heightened pleading requirements, especially for actual and justifiable reliance on statements by Enron; and (3) Plaintiffs' TSA claims arising before September 11, 1997 are time-barred.

More specifically with regard to the second category, Merrill Lynch claims that Plaintiffs futilely attempt to satisfy Rule 9(b) by demonstrating reliance in four ways:  (1) broad, conclusory statements that they relied generally on the "Buy" recommendations of Defendants' research analysts from 1997-2001; (2) allegations that Plaintiff SM&R, the broker-dealer subsidiary of American National Insurance Company, received some research reports published by Merrill Lynch in 2001, with the First Amended Complaint including several excerpts from them; (3) allegations that Plaintiffs relied generally on unspecified financial

---

[31] Nor, this Court notes, will a conclusory allegation that Merrill Lynch knew about Enron's fraudulent accounting from due diligence investigations for various Enron securities offerings be adequate.

statements filed by Enron with the SEC during the period of alleged wrongdoing; and (4) allegations that Defendants failed to disclose Enron's fraud.   None of these representations is pled with particularity.   There are no allegations that Defendants had any direct contact with Plaintiffs.   Nor have Plaintiffs pled facts showing that Defendants had a duty to disclose for claims based on omissions.

Regarding the first category, this Court previously determined that "vaguely referenced recommendations by . . . brokers to investors generally to buy Enron securities on the ground that the company was strong" were insufficient to demonstrate reliance. *American Nat'l Ins. Co. v. J.P. Morgan Chase & Co.*, 388 F. Supp.2d 780, 785 (S.D. Tex. 2005).[32]   Merrill Lynch insists that the complaint's argument that defendants "knew the substance and recommendations contained in their analyst reports were available to and reported to plaintiffs and other investors" is insufficient to show intent to induce reliance under Texas law. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 581 (Tex. 2001)(In the investment community, "even an obvious risk that a third person will rely on a representation is

_____

[32] In their surreply, Plaintiffs point out that the complaint at issue in this order was re-pled and subsequently not challenged in a motion to dismiss.   They also state that their First Amended Complaint here is similar to the re-pled complaint in that action. Maintaining that the Court has not adopted a per se rule that analyst reports and "buy" recommendations cannot be used as a basis for a claim, they point to this Court's statement in *In re Enron Corp. Sec., Derivative and "ERISA" Litig.*, 2006 U.S. Dist. LEXIS 43146, *286 n.119 (S.D. Tex. June 5, 2006)("Clearly the substance of such reports would need to be examined on a case by case basis to determine if the analysts' statements independent of the financial statements were false and misleading.").

not enough to impose liability" or show fraudulent intent; "[t]he maker of the misrepresentation <u>must have information</u> that would lead a reasonable man to conclude that there is <u>an especial likelihood</u> that it will reach those persons and will influence their conduct").

The second category, i.e., identifying several sentences from some Merrill Lynch research reports published in 2001, is also insufficient to satisfy Rule 9(b).  Merrill Lynch maintains that the quoted statements are properly considered not to be statements of fact, but opinions of research analysts; with the few exceptions requiring a finding of special knowledge or recklessness, expressions of opinion cannot constitute the basis of an actionable claim for common law fraud in Texas.  *Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1358 (S.D. Tex. 1994)("To be actionable, a representation must be one of material fact, not opinion. . . . There are narrow exceptions to this rule.  An opinion may constitute fraud if the speaker has knowledge of its falsity . . . .  An expression of opinion may also constitute fraud if the speaker purports to have special knowledge of facts that will occur or exist in the future. [citations omitted]"); *Trentholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)("Pure expressions of opinion are not actionable.  It has been held that a representation, to be actionable, must be a representation of material fact.").[33]    Even if they were

_____

[33] This Court points out that under Texas law,

> Whether a statement is an actionable statement
> of "fact" or merely one of "opinion" often

actionable, Plaintiffs have not alleged facts showing that the authors or speakers knew those representations were false when they were made; Plaintiffs cannot rely on allegations that other employees of Merrill Lynch knew the representations were false at the time they were made.   Morever, the allegation that one Plaintiff, SM&R, *received* several of Merrill Lynch analysts' research reports does not show that SM&R, not to mention the other Plaintiffs, justifiably relied upon them.   Nor do Plaintiffs explain their alleged reliance.[34]

The third category of alleged misrepresentations, Enron's financial statements, are also too generally pled to

---

depends on the circumstances in which a statement is made.   Among the relevant circumstances are the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future.

*Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995), *citing Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).

[34] Although the Court does not examine proof on a Rule 12(b)(6) motion to dismiss, Merrill Lynch claims that of the 31 investments in Enron stock by Plaintiffs, approximately 24 occurred before the publication of reports on which they claim to have relied.   Merrill Lynch also asserts that while Plaintiffs claim to have relied upon a positive comment by analyst M. Shawn Foley regarding the Enron 0% Convertible Bonds due in 2021, it does not appear from the complaint that any Plaintiff purchased them.

In response, Plaintiffs state that they have alleged dissemination of deceptive analysts' reports between 1998 (including hiring of Eassey after firing of Olson) and 2001.   The complaint alleges that Plaintiffs reviewed Enron's SEC-filed statements, financial information services, analysts' reports, etc. during this period.   #46 at ¶¶ 407-11, 460-62.   They maintain that it was the cumulative effect of these reports and the failure of Merrill Lynch to speak out, to tell the truth, and to downgrade their Enron recommendations that caused injury to Plaintiffs. *Quaak*, 445 F. Supp.2d at 140-41.

support reliance.  Plaintiffs fail to identify a single piece of
information in any financial statement, or explain how the
statements were false and in what ways Plaintiffs relied on them,[35]
but only point to statements following Enron's bankruptcy by some
Enron directors admitting they misrepresented the financial
condition of the company.  After-the-fact admissions by Enron
directors do not establish contemporaneous reliance by Plaintiffs.

        Finally, urges Merrill Lynch, to the extent that
Plaintiffs' common law fraud, conspiracy, and aiding and abetting
statutory fraud claims are predicated on omissions, they should be
dismissed because there was no duty on the part of Merrill Lynch
to disclose.  *United Teacher Assocs. Ins. Co. v. Union Labor Life
Ins. Co.*, 414 F.3d 558, 567 (5th Cir. 2005)(nondisclosure is
neither fraudulent nor negligent in the absence of a duty to
disclose); *Sergeant Oil & Gas*, 861 F. Supp. at 1358 ("When no
representations are made, the failure to disclose information does
not constitute fraud in the absence of a fiduciary or other
special relationship between the parties"); *Ins. Co. of N. Am. v.
Morris*, 981 S.W.2d 667, 674 (Tex. 1998)("Generally no duty of
disclosure arises without evidence of a confidential or fiduciary
relationship.").  Merrill Lynch claims that Plaintiffs have not
pled any facts demonstrating that defendants had a duty to
disclose information to Plaintiffs, but only conclusorily stated
that they had and cited *Lesikar v. Rappeport*, 33 S.W.2d 282, 319

---

[35] Merrill Lynch notes that this Court previously dismissed
identical allegations by these Plaintiffs against JPMorgan Chase.
*Am. Nat'l Ins. Co.*, 388 F. Supp. 2d at 785.

(Tex. 2000).  First Amended Complaint at ¶ 520.  *Lesikar*, *id.*, identified four sources giving rise to a duty to disclose for actionable non-disclosure fraud that are not relevant to the facts here:  (1) when one is in a fiduciary relationship (which was the situation in *Lesikar*); (2) when one voluntarily discloses some information, but not all of the pertinent information; (3) when new information makes an earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression.

Even if the Court finds that Plaintiffs have pled facts demonstrating a duty to disclose, Merrill Lynch insists that Plaintiffs' allegations fail to demonstrate actual and justifiable reliance by plaintiffs on the alleged non-disclosures.  Texas courts require a showing of actual reliance and do not recognize a fraud-on-the-market theory of reliance for common law claims.  *Griffin v. GK Intelligent Sys., Inc.*, 87 F. Supp.2d 684, 690 (S.D. Tex. 1999); *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 270 (N.D. Tex. 1990).

Last, maintains Merrill Lynch, Plaintiffs' conspiracy theory fails because they have not adequately pled a meeting of the minds, i.e., asserted facts demonstrating that Merrill Lynch conspired with Enron with the common objective and goal of defrauding Enron investors in general, not to mention Plaintiffs in particular.

**E.  Plaintiffs' Sur-reply (#58)**

With regard to the adequacy of their common law fraud claims, Plaintiffs contend that they relied on Merrill Lynch's

misrepresentations, both affirmative and by omission. Their claims are based on a "duty to disclose"; they charge that Merrill Lynch's conduct was fraudulent and that Merrill Lynch did not disclose the truth when its agents/analysts issued numerous reports and recommendations containing information from Enron financial statements that Merrill Lynch knew to be false. Merrill Lynch had a duty to disclose because its analysts' reports, promulgated in Merrill Lynch's name, voluntarily made partial disclosures that conveyed a false impression and that failed to disclose the whole truth. After they were disseminated, Merrill Lynch still failed to correct the false information or disclose new adverse information of which it became aware. The First Amended Complaint, according to Plaintiffs, provides details about Merrill Lynch's knowledge of Enron's true financial conditions and fraudulent financial statements and about Merrill Lynch's participation in making those financial statements false, especially regarding the Nigerian Barge Transaction and the Power Trades Transaction, and their impact on 1999 year-end financial reports. It points to allegations about analyst Donato Eassey's use of false financial data about Enron, data that Merrill Lynch helped to make, at ¶¶ 399-402.[36] Plaintiffs assert that fraudulent intent can be inferred from Merrill Lynch's firing of John Olson for his less than enthusiastic reports on Enron and his replacement by another who immediately upgraded Enron's rating.

---

[36] A review of these paragraphs reveals statements that Plaintiffs have failed to explain why or how they are false or any specific connection between them and Merrill Lynch, the Nigerian Barge Transaction or the Power Trades Transaction.

The fact that the analysts were so controlled and that Merrill remained silent while knowing that these fraudulent reports were being put out in its name by its agents supports imposing liability for fraud on Merrill Lynch; "[t]he publications and their authors were merely tools of . . . Merrill in perpetrating fraud."[37]   Merrill Lynch not only remained silent when false analyst reports were issued under its name, but also actively participated in insuring that its analysts' reports were false and misleading.  Plaintiffs' claim is not that the *analysts* made their reports and "buy" recommendations with the knowledge that their reports were false and misleading when made; instead Plaintiffs claim that Merrill Lynch, as part of a larger scheme to defraud, helped Enron create fraudulent financial data and financial reports that in turn caused the analysts to make misleading report.  The analysts are not alleged to be at fault, nor are they named defendants, but are only characterized as "unwitting pawn[]s in the overall chess game." *See Quaak v. Dexia, S.A.*, 445 F. Supp.2d 130, 141 (D. Mass. 2006).   Furthermore Merrill Lynch continued the deception long after Enron filed for bankruptcy protection.  #46 at ¶ 455 (attorney for Merrill Lynch's Vice President in September 2002 still denying any wrongdoing by Merrill Lynch in the Nigerian Barge transaction).[38]

---

[37] Thus Plaintiffs argue that the analysts' knowledge of Enron's fraud in not required to assert claims against Merrill Lynch.

[38] The Court observes that one would hardly expect an attorney to publicly concede his client committed fraud.

Furthermore, argue Plaintiffs, face-to-face or direct communications are not required for fraud under Texas law; such a cause of action exists where the false representation was made with the intent of reaching and deceiving a third person (here "the investment community") and thereby causing that third person injury; privity is not required. *In re Enron Corp.*, 388 F. Supp.2d 780, 784 (S.D. Tex. 2005). Reliance also may be indirect. *Hawkin v. Upjohn Co.*, 890 F. Supp. 609, 612 (E.D. Tex. 1994)(adopting the Restatement (Second) of Torts § 533: "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly or to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.").

In response to Defendants' argument that Plaintiffs fail to identify a single, particular false fact within a particular misrepresentation or omission upon which to base reliance, Plaintiffs quote *Rubinstein,* 20 F.3d at 168: "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.'" They have alleged that the Merrill Lynch analyst reports were part of the "total mix" of information on which they based their investment

decisions.   # 46 at ¶ 462.   *See Quaak*, 445 F. Supp.2d at 142
("Courts have acknowledged that analyst recommendations may be
material.   Furthermore, it is sensible to assume that the 'buy'
recommendation, coupled with the financial data, to a reasonable
investor, would have altered the total mix of information
available.   The omission was no doubt material, based on the fact
that once the truth was known about L&H the stock crashed and the
company went into bankruptcy.").

Plaintiffs also argue that reliance is a fact-specific
inquiry "generally considered inappropriate for determination on
a motion to dismiss." *Allied Irish Banks, P.L.C. v. Bank of
America, N.A.*, No. 03 Civ 3748 (DAB), 2006 WL 278138, *8 (S.D.N.Y.
Feb. 2, 2006).   Therefore a lower pleading standard that that
under Rule 9(b) is required for reliance. *Anthony v. Yahoo!,
Inc.*, 421 F. Supp.2d 1257, 1264 (N.D. Cal. 2006), *citing Indiana
Bell Tel. Co. v. Ward*, No. IP 02-170-C H/K, 2002 WL 32067296, *3
(S.D. Ind. Dec. 6, 2002)("Rule 9(b)'s standard applies to the
specifics of alleged misrepresentations, but the notice pleading
requirements of Rule 8 apply to other aspects of the plaintiff's
complaint, such as damages, reliance, or a defendant's state of
mind.").

Plaintiffs also point out that they bring their claims
under the Texas Business & Commerce Code against all Defendants
under section 27.01(d), the provision for aider and abettors.
Privity is not required. *Shatterproof Glass Corp. v. James*, 466
S.W.2d 873, 877 (Tex. Civ. App.–Fort Worth 1971, writ ref'd
n.r.e.).   Therefore Plaintiffs do not have to allege any contact

with Defendants.   To plead that Enron is a primary violator under
section 27.01(a), Plaintiffs need only allege facts showing that
Enron made false representations or omissions of material fact for
the purpose of inducing Plaintiffs and other investors, and that
Plaintiffs relied on those false representations.   They maintain
they have done so in their complaint at ¶¶ 40-76, 457-64.   As for
Defendants' objection that Plaintiffs did not identify a single
piece of information in a financial statement of Enron on which
they relied, Plaintiffs claim they relied upon the totality of the
financial statements falsely painting Enron to be a financially
strong company because of both erroneous statements and material
omissions of adverse facts.   *Id.* at ¶¶ 55-57, 61-66, 69-72, 457-
61.   If the Court requires more specific identification of the
misrepresentations in Enron's financial statements, Plaintiffs
request permission to replead and include excerpts from their
accounting expert's report.

     To Defendants' objection that many Plaintiffs purchased
their Enron securities before the analyst reports were issued, as
noted earlier Plaintiffs argue that they have pled that deceptive
analyst reports were issued between 1998 and 2001.   #46 at ¶¶ 407-
11 (In 1998 Olson was fired and Eassey became Merrill's Enron-
coverage analyst and upgraded Enron; ¶¶ 399-400 (in January 2001
Eassey wrote "glowing reports"); *id.* at ¶¶ 460-62 (alleging
Plaintiffs monitored and relied upon analyst upgrades and
downgrades before making purchases or sales).   The alleged that
"Defendants' transactions with Enron materially altered the 'total
mix' of information upon which investment decisions were made."

#46 at ¶ 462.   To the degree that Defendants argue that Plaintiffs' reliance was not based on face-to-face or telephonic communications with Defendants, Plaintiffs respond that under Texas law, whether communications are direct or indirect is not relevant; instead "a fraud cause of action exists where the false representation was made with the intent of reaching and deceiving a third person and thereby caused that third party injury; privity is not required between the fraudfeasor and the person he is trying to influence to establish a fraud claim." *In re Enron Corp.*, 388 F. Supp. 2d at 784 (*citing Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.,* 51 S.W.3d 573, 578 (Tex. 2001)); *In re Enron Corp.*, 235 F. Supp.2d 549, 604 (S.D. Tex. 2002).[39]

---

[39] In *In re Enron Corp.*, 235 F. Supp.2d at 604, this Court wrote,

> <u>Restatement (Second) of Torts</u> § 531 (1977) provides, "One who makes a fraudulent misrepresentation is subject to liability to the person or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." Although Texas has not formally adopted § 531, which does not require privity, the Texas Supreme Court recently stated that Texas' "jurisprudence, which focuses on the defendant's knowledge and intent to induce reliance, is consistent with the *Restatement* and with the law in other jurisdictions that have considered the issue." *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.,* 51 S.W.3d 573, 578 (Tex. 2001). The high court observed, "[Texas] fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on

Moreover, indirect reliance is also sufficient. *Hawkins v. Upjohn Co.*, 890 F. Supp. 609, 612 (E.D. Tex. 1994)(applying Texas common law of fraud and adopting Restatement (Second) of Torts § 533[40]). Plaintiffs point out that Defendants do not dispute that their reports were disseminated to Plaintiffs and the investment community at large nor that they had reason to expect that Plaintiffs and others would consider them in making investment decisions about Enron securities.

As for Merrill Lynch's challenge that Plaintiffs failed to allege facts demonstrating a meeting of the minds for the conspiracy cause of action, Plaintiffs insist that there is

---

> whether the misrepresentation was intended to reach a third person to induce reliance" and pointed out instances where Texas courts "have held that a misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct." *Id.* The Texas Supreme Court further commented, "While it is true that Texas courts have not used the words 'reason to expect' when discussing fraud's intent element, a defendant who acts with knowledge that a result will follow is considered to intend that result." *Id.* at 579, *citing Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48-49 (Tex.1998).

[40] Section 533 reads,

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

*Hawkins*, 890 F. Supp. at 612 (quoting § 533).

sufficient evidence from which to infer a meeting of the minds:
e.g., Merrill Lynch's knowing and purposeful involvement in the
fraudulent 1999 year-end transactions, its role in the firing of
the analyst who reported Enron's true financial condition,
Tilney's exceedingly close relationship with Andrew Fastow, and
Defendants' participation in the Nigerian Barge Transaction and
the Power Trades Transaction.

Finally, Plaintiffs contend that Rule 9(b) does not
apply to the pleading of "holder" versus "non-holder" claims, nor
to the pleading of "derivative" versus "direct" claims.  Should
the Court not summarily deny Defendants' motions, Plaintiffs
request leave to amend their complaint.  Not only did they assume
that Rule 8 notice pleading applied to these claims, but they
represent that additional facts were discovered after their last
complaint was filed, including from Fastow's deposition, that they
would like to incorporate.

## V.  Court's Decision

The Court has reviewed the First Amended Complaint and
the parties' briefing on the motions to dismiss and has found
somewhat of a "mixed bag."  The parties have not clearly
distinguished the elements of the various causes of action.  While
the Court finds there are significant pleading deficiencies, as
noted below, it will allow Plaintiffs to supplement their
complaint to attempt to cure the problems.[41]

---

[41] Leave to amend is left to the sound discretion of the court
and should be freely granted under Fed. R. Civ. P. 15(a), unless
the court finds denial appropriate based on a plaintiff's undue
delay, bad faith or dilatory motive, repeated failure to cure

**A. Holder Claims**

The Court agrees with Merrill Lynch that the express language of the Texas statutes excludes "holder" claims from coverage.  As for Texas common law, as stated in its Opinion and Order of Reconsideration in G-02-299, *American National Insurance Co., et. al. v.  J.P. Morgan Chase & Co.*, instrument #66, entered April 19, 2007, the  Court made an "Erie guess"[42] and concluded that Texas probably would not recognize "holder" claims under common law fraud,[43] but that if it did, it would do so only if

_____

deficiencies by previously allowed amendments, undue prejudice to the opposing party from allowing amendment , and futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *United States of America ex rel. Adrian v. Regents of the University of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004).  This Court finds that none of these circumstances would justify denying Plaintiffs the right to amend/supplement here.

[42] The term, "Erie guess," evolved from *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.").  Where the state's highest court has not ruled on the issue, as the Texas Supreme Court has not determined whether "holder" claims are cognizable under common law fraud or whether they are derivative or direct claims, the court "must make an *Erie* guess as to what the Texas Supreme Court would most likely decide." *Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 558 (5th Cir. 2002).  *See also Hulin v. Fibreboard Corp.,* 178 F.3d 316, 318-19 (5th Cir. 1999).

[43] While not permissible in federal court, some state courts have allowed "holder" claims to be brought under common law fraud, although actual reliance is a required element.  Nevertheless, the majority have not recognized "holder" claims.  As summarized by Judge Davis in *WM High Yield Fund v. O'Hanlon*, No. Civ. A. 04-3423. 2005 WL 1017811, *13 (E.D. Pa. Apr. 29, 2005),

In declining to permit "holder" actions, other courts have elucidated the policy problems therewith. *See In re Worldcom, Inc, Sec. Litig.*, 336 F. Supp.2d 310, 318-23 (S.D.N.Y. 2004).  The Supreme Court, in reaching its decision that "holder" claims were not

heightened pleading standards were satisfied.  Specifically, the
Court looked at decisions from those courts that did permit such
claims, including the vacated opinion in *Shirvanian I*,[44] *Small v.
Fritz Cos., Inc.*, 65 P.3d 1255, 1256-57 (Cal. 2003)(holding that
California permits a shareholder, who was wrongfully induced to

-----

> permissible in actions brought under Rule 10b-
> 5, explained that holder claims are virtually
> impossible to verify because they are based on
> a plaintiff's representation that he would []
> have purchased or sold the securities had he
> known about the misrepresentation. *Blue Chip
> Stamps v. Manor Drug Stores*, 421 U.S. 723,
> 742-43 . . . (1975).  The same rationale is
> applicable to a common law "holder" claim.
> Other courts have rejected holder claims as
> being too speculative. *See Chanoff v, United
> States Surgical Corp.*, 857 F. Supp. 1011 (D.
> Conn. 1994).  As the *Chanoff* court explained,
> "holder claims" violate "the established
> principle that a plaintiff cannot recover
> profits which might have been realized if he
> had not been deceived, unless there is
> evidence by which such profits can be
> estimated with reasonable certainty." *Id.* at
> 1018.  Finally, it is notable that a
> plaintiff's damages in "holder" cases arise
> not from misrepresentations, but from the
> eventual disclosure of accurate information
> and its effect on the market.  As the court
> noted in *Arent Distribution Sciences, Inc.*,
> Plaintiffs were not harmed because they were
> unable to realize the true value of their
> stock—they were harmed because the true value
> of their stock was zero." 975 F.2d 1370, 1374
> (8th Cir. 1999).

*See also In re Worldcom, Inc. Sec. Litig.*, 336 F. Supp.2d 310, 323
(S.D.N.Y. 2004)(stating, "Many other jurisdictions that have
considered 'holder' claims based on their common law have rejected
them because of the inherent difficulty in pleading and proving
reliance, loss causation and/or damages.").

[44] *Shirvanian v. Defrates ("Shirvanian I")*, No. 14-02-00447,
2004 Tex. App. LEXIS 182 (Tex. App.–Houston [14th Dist.]
2004)(relying in part on California law), *op. withdrawn*, 161 S.W.3d
102 (Tex. App.–Houston [14th Dist.] 2004, pet. denied)("*Shirvanian
II*").

hold a stock rather than sell it, to sue under common law fraud or negligent misrepresentation, but requires him to allege fraud with "specificity to show a bona fide claim of actual reliance"),[45] and *Rogers v. Cisco Sys., Inc.*, 268 F. Supp.2d 1305, 1311-12 & n.13 (N.D. Fla. 2003)(predicting that Florida common law would permit fraud "holding" claim, but not Florida securities statutes, but finding plaintiffs failed to plead reliance with sufficient particularity).[46]

---

[45] In *Small v. Fritz Cos.*, 65 P.3d at 1265, the California Supreme Court wrote,

> In a holder's action a plaintiff must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations. Plaintiffs who cannot plead with sufficient specificity to show a bona fide claim of actual reliance do not stand out from the mass of stock holders who rely on the market.

[46] In *Rogers* the Court found that the purpose of the heightened pleading requirements, especially relating to reliance, was to separate "plaintiffs who actually and justifiably relied upon the misrepresentations from the general public, who, though they did not so rely, suffered the loss due to the decline in share value." 268 F. Supp. 2d at 1314 n.18. Therefore it found "too vague" plaintiffs' allegations that they had read defendants' reports and financial statements, had "refrained from selling their stock" in reliance on that information, and that if they had known the actual financial condition of the company, they would have sold their shares before the stock price plummeted. *Id.* at 314. The court dismissed the "holder" claims brought under Florida law for a failure to allege how many shares the plaintiffs would have sold and when they would have sold them. *Id.*

In the only Texas case, the subsequently withdrawn opinion designated *Shirvanian I*, allowing the "holder" claims before it, the Texas Fourteenth Court of Appeals highlighted the fact that the case involved an "unusual" factual predicate of plaintiffs who had "direct dealings with the defendants" and who made the alleged misrepresentations directly to the defendants; that "critical feature" of personal contact made it more like an "ordinary case of deceit" than a misrepresentation in the vast public securities markets and the Fourteenth Court of Appeals expressly limited its holding to such a "narrow setting."  The appellate court emphasized that "[t]his type of holding claim will always have a very narrow pool of plaintiffs."  2004 Tex. App. LEXIS 182, at *55, 58.  The court upheld such claims only where there were "direct, face-to-face or telephone misrepresentations" and where plaintiffs sufficiently asserted that "they had a specific plan to sell their shares at a date certain."  *Id.* at 58-59.  Moreover, the plaintiffs were not "'complete bystanders.  The [plaintiffs] were the largest individual shareholders" of the defendant.  *Id.* at 58.[47]

---

[47] In *Neal v. Smith Barney*, Judge Cote examined *Shirvanian I* and concluded that Texas would not recognize "holder" claims generally, and at most, would do so only where the "narrowly crafted circumstances" in that case were paralleled. *Neal v. Smith Barney & Co. Inc. (In re WorldCom, Inc. Sec. Litig.)*, Civ. No. 02-3288 (DLC), 2006 WL 752770, at *2-3 (S.D.N.Y. March 24, 2006)(dismissing "holder" claims because "[t]here is no basis to predict that the Texas Supreme Court would recognize a holder claim that would encompass [Plaintiff's] allegations"; "there is general agreement that holder claims cannot be successfully pled under the common law.  The principle deficiency to which courts point is the impediment to proof of damages."); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 DLC, 04 Civ. 0232 DLC, 2006 WL 728518, *4

"Holder" Plaintiffs here have failed to allege any facts demonstrating any direct, personal communication with Merrill Lynch; instead they have expressly pled that they relied on information available generally in the market place at large.  Nor have they pointed to actions suggesting their actual, direct reliance on Merrill Lynch that would distinguish them from any other Enron investors who did not rely on Merrill Lynch's analyst reports disseminated to the public.  The First Amended Complaint, ¶ 457, states that Plaintiffs "made investment decisions to purchase and to hold securities, based upon reviews of financial statements filed with the Securities and Exchange Commission and upon information obtained from financial information services, such as Bloomberg, to which Plaintiffs subscribe."  *See also* ¶¶ 458-61.  Nor have Plaintiffs asserted that "they had a specific plan to sell their shares at a date certain."  Thus even if Texas were to recognize holder claims but require heightened pleading standards, Plaintiffs have failed to meet them.

Moreover, the holder claims are derivative; every securities holder would be affected in the same way, i.e., by the loss of value in their Enron investments, a general injury to shareholders and creditors that derives from harm to the corporation as a whole caused by the alleged fraud perpetrated by Merrill Lynch and Enron officers and directors.  *Smith v. Waste*

---

(S.D.N.Y. March 22, 2006)("The few jurisdictions that have allowed 'holder' claims to proceed have generally required allegations of specific reliance and/or direct communication between a plaintiff and defendant.").

*Management, Inc.*, 407 F.3d 381, 384-86 (5th Cir. 2005); #66 in G-02-299 at 25-40.   A bankruptcy trustee[48] could have brought the fraud claims against the officers at Enron involved and against Merrill Lynch at the commencement of Enron's bankruptcy.

**B.   TSA Claims**

Plaintiffs have asserted that Enron was a primary violator of the statute, offering and selling securities by affirmative misrepresentations or omissions in its financial reports.

While Plaintiffs have sufficiently pled many of the circumstances of the alleged fraud involving Enron and Merrill Lynch, more than enough to an inference of intent on the part of Merrill Lynch and Tilney to deceive and defraud or reckless disregard for the truth of the primary violator's misrepresentations as well as Merrill Lynch's own, the Court finds as the threshold deficiency in the pleading of all the causes of action, that more specificity about the particular misrepresentations made by Enron is necessary to satisfy Rule 9(b).   To establish the derivative aiding and abetting claim against Merrill Lynch and Tilney, Plaintiffs must ultimately prove with specificity the fraud of the primary violator, Enron, even if

--------

[48] This Court notes that, in an unusual procedure, no trustee was appointed for the Enron bankruptcy estate.   Instead Bankruptcy Judge Arthur Gonzalez appointed Stephen Cooper, a turnaround expert, as Enron's Chief Executive Office and Chief Restructuring officer.   He also appointed Neal Batson as Bankruptcy Examiner to investigate any possible fraud, and he gave the Creditors Committee the authority to sue on behalf of the debtor's estate.   It did sue JPMorgan Chase in the bankruptcy court on behalf of the debtor's estate.

it is not named as a defendant here.   More than a "general reference" to Enron's 1999 financial reports and SEC filings is needed; although Plaintiffs plead specific figures for sham "earnings" from the two transactions with Merrill Lynch, they fail to point to where in Enron's financial documents Enron (and its auditor) misrepresented these amounts.  *Southland Securities*, 365 F.3d at 362 ("Rule 9(b) requires the plaintiff to 'specify the statements contended to be fraudulent' . . . when and where the statements were made").  Alternatively if Plaintiffs are alleging that the "true" numbers were omitted by Enron, Plaintiffs need to point to "'the place in which  the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading.'"   *Carroll*, 470 F.3d at 1174.   Plaintiffs have represented they can do so with the help of their expert accountant if allowed to replead, and the Court will allow them to supplement their complaint to do so.

        With regard to Plaintiffs' claim against Merrill Lynch for aiding and abetting under article 581-33F(2), the Court finds that the complaint adequately pleads facts demonstrating that Merrill Lynch had a "general awareness" of its role as a secondary violator under the statute (its manipulation in firing Olson and replacing him with a more positive Enron-securities analyst for Merrill Lynch at Enron's behest, promises of excessive short-term returns, secret guaranteed takeout with no risk in the Nigerian Barge Transaction for Merrill Lynch, the emails, the modified drafts of the agreement, James Brown's admonition, the confidentiality agreement with Enron before the Power Trades

Transaction, the suspicious mirror-image options in that deal and
the December 29, 1999 stating they would "cross-default" each
other, the excessive fees of the Power Trades, the need  to check
that Arthur Andersen approved the accounting, the "potential
defense" letter from Causey, the indictment and trial of four of
its employees with respect to the Nigerian Barge Transaction, now
to be retried, and the agreements with the SEC on the Nigerian
Barge Transaction and with DOJ regarding both transactions).  The
complaint also demonstrates that Merrill Lynch gave substantial
assistance to Enron in cooking its books and its SEC-filed reports
through the Nigerian Barge and Power Trades transactions, which
allowed Enron to deceptively report $60 million in income, a
material 30% increase, in 1999 and which enabled Enron to meet its
earnings target.  The complaint states facts that suggest Merrill
Lynch acted with intent to deceive investors like Plaintiffs or
acted with reckless disregard regarding Enron's alleged untruthful
or illegal activity.  The statute does not require any privity or
contact between Merrill Lynch and Plaintiffs, nor any reliance by
Plaintiffs on Merrill Lynch's misrepresentations or wrongdoing.
*See* this opinion at 10-12.  The allegations regarding the LJM2
participation, however, are not sufficiently specific to support
a fraud claim against Merrill Lynch and Tilney.

      With regard to the "buy" recommendations and the
"glowing" reports of Merrill Lynch's analysts, Plaintiffs have
provided some specific examples, places, and times when these were
made by an identified speaker and what was not revealed that made

the statements misleading.   #46 at ¶¶ 399-405.   Additional specific examples would buttress the claim.

Reliance is not an element of a TSA claim.

Against Tilney individually, there are also enough factual allegations to show that he had a "general awareness" of his role in the violation of the TSA to help Enron "cook its books" and that he acted with the intention of deceiving investors like Plaintiffs or reckless disregard about truth or the law (the December 21, 1999 memorandum, direct verbal confirmation from Fastow that Merrill Lynch would be taken out of the Nigerian Barge transaction within six months and from Causey that Arthur Andersen had approved the accounting treatment that would follow from the Power Trades Transaction after the STRC initially rejected the deal because its sole purpose was to generate bogus income for Enron, his role as a LJM2 limited partner and prior knowledge that LJM2 would purchase the Merrill Lynch's interest in the Nigerian Barges, the adverse inference that might be drawn down the line from his invoking the Fifth Amendment) and that he gave substantial assistance to Enron in pushing the deals through the STRC.

The only challenge raised by Defendants to the TSA claim is a statute of limitations defense.  Because Tilney has failed to identify any of the claims that he maintains are time-barred, no less allege facts to show that they are, his motion for dismissal of the TSA claims on statute of limitations grounds is denied. Moreover, Plaintiffs have stated that the only claims arising before September 11, 1997 are their holder claims, which the Court

has concluded are not cognizable as pled here.  Thus the Court denies the motion to dismiss on limitations grounds.

## C.  Section 27.01(d)

Again Plaintiffs have not adequately pled with Rule 9(b) particularity the various misrepresentations purportedly made by Enron.  Moreover, because their claim under ¶ 27.01(d) is based on nondisclosure, to be actionable Plaintiffs must allege facts demonstrating with particularity that Merrill Lynch and Tilney had a duty to disclose, but Plaintiffs have failed to do so.  *In re Enron Corp.*, 388 F. Supp.2d at 788.  Plaintiffs have asserted the rule that there are three situations in which a duty to disclose may arise are present here:  (1) Merrill Lynch analysts and Enron voluntarily disclosed partial information but not the whole truth; (2) they made representations and failed to disclose new information that made the earlier misrepresentation misleading or untrue; and (3) they made a partial disclosure and conveyed a false impression thereby.  *Id.*  Plaintiffs have failed to allege facts relating to specific misrepresentations made by Enron to correspond to any of these situations.  In contrast they have adequately alleged facts showing why a duty to disclose additional information should be imposed on Merrill Lynch with respect to the particular quoted statements by Merrill Lynch analysts set out in the complaint.

With respect to reliance, an element of all fraud causes of action except the TSA, Plaintiffs are correct that Texas has long recognized that "a misrepresentation made through an intermediary is actionable if it is intended to influence a third

person's conduct" and that Plaintiffs may show Defendants' intent to induce them to purchase Enron securities indirectly. *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins.*, 51 S.W.3d at 578, *citing Gainesville Nat'l Bank v. Bamberger*, 77 Tex. 48, 13 S.W. 959 (1890), and *American Indem. Co. v. Ernst & Ernst*, 106 S.W.2d 763, 765 (Tex. App.–Waco 1937, writ ref'd). Thus Plaintiffs' lack of privity with Merrill Lynch does not, by itself, defeat their fraud claims.

Nevertheless this Court agrees with Merrill Lynch that under Texas law Plaintiffs cannot establish intent to induce reliance based on the argument that Defendants had a reason to expect that Plaintiffs and other investors would review and rely on Enron's financial reports, SEC-filed documents, analyst reports and analyst recommendations simply because these materials are standardly disseminated into the marketplace and available to the investing community. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d at 580 ("Even an obvious risk that a misrepresentation might be repeated to a third party is not enough to satisfy the reason-to expect standard [of the Restatement (Second) of Torts § 531]; rather the alleged fraudfeasor must 'have information that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons *and will influence their conduct* [emphasis in original].").

The facts in *Pacific Mutual*, 51 S.W.3d at 575-77, relevant to this action, are as follows. Interfirst Bank, in 1982, issued a series of notes scheduled to mature in 1989. After

Interfirst began having financial troubles, it merged in 1986 with RepublicBank Corporation.  Ernst & Young audited RepublicBank's financial statements for the year ending December 31, 1986, confirming RepublicBank's financial stability, and issued an unqualified opinion[49] that the statements in the report fairly represented RepublicBank's financial state; that report and financial statement were incorporated by RepublicBank into its annual report to its shareholders and the Form 10-K filed with the SEC.  Moreover, after the merger RepublicBank offered a number of securities and prospectuses that incorporated the 1986 Form 10-K and Form S-3 registrations statements, with Ernst & Young's audit opinion and financial information.

Pacific purchased some of the original Interfirst notes in 1987, one month after the merger.  Subsequently RepublicBank filed for bankruptcy and the Interfirst notes lost their value. Pacific sued Ernst & Young and claimed that in deciding to buy the notes, Pacific had relied on the report of the auditor and on documents that incorporated it and that were filed with the SEC, e.g., Form S-3 registrations and Form 10-Ks of Republic Bank, filed in compliance regulations relating to the Securities Act of 1933 and the Securities Act of 1934.  Pacific contended that the

---

[49] "An 'unqualified' or clean audit is the highest level of assurance that an auditor can give an organization's financial statements.  Accountants will 'qualify' their opinion where discrepancies are identified in a client's financial statements." *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 663 n.4 (3d Cir. 2002).

audit opinion misrepresented that the audit report complied with GAAP, that the financial statements misrepresented RepublicBank's financial position, and that Ernst & Young had violated GAAS.

Ernst & Young moved for summary judgment, arguing that as a matter of law it did not specifically intend for Pacific to rely on representations in its 1986 audit report of RepublicBank when Pacific decided to purchase the Interfirst Notes. The trial court granted the summary judgment. The court of appeals reversed, concluding there were fact issues on each element of Pacific's common-law fraud cause of action, including intent ("reason to expect"), to which it applied the Restatement (Second) of Torts § 531 (1977):

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

The Texas Supreme Court found that while not employing the "reason to expect" language, Texas courts examining intent to defraud have concluded that "a defendant who acts with knowledge that a result will follow is considered to intend the result," consistent with § 531, which "requires a degree of certainty that goes beyond mere foreseeability." 51 S.W.3d at 579-80. Nevertheless the high court determined that the appellate court had not properly applied the "reason-to-expect" standard in § 531 and emphasized that comments to § 531 "illustrate the narrow scope of the reason-to-expect standard and foreclose the potential for

'unlimited liability. . . .'" *Id*. at 580.  *See, e.g.*, comment d (requiring that the fraudfeasor "have information that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons *and will influence their conduct* [emphasis in original]." *Id*.  In sum, "[T]he claimant's reliance must be 'especially likely' and justifiable, and the transaction sued upon must be the type the defendant contemplated." *Id*.

Pacific presented affidavit evidence, based on generalized industry practice or understanding that prospectuses and proxy materials are widely distributed throughout the investment community and that public accounting firms like Ernst & Young expected that investors would rely on them and on SEC-filed documents in evaluating securities for investment.  It further argued that § 536 of the Restatement (Second) of Torts supported a presumption that Ernst & Young had reason to expect Pacific's reliance on publicly available information, especially documents filed with the SEC pursuant to statutes designed to protect investors:

> If a statute requires information to be . . .
> filed . . . for the protection of a particular
> class of persons, one who makes a fraudulent
> misrepresentation in so doing is subject to
> liability to the persons for pecuniary loss
> suffered through their justifiable reliance
> upon the misrepresentation in a transaction of
> the kind in which the statute is intended to
> protect them.

51 S.W.3d at 581-82, quoting § 531 in relevant part.  Comment e of the Restatement indicated that "the general purpose behind a statute requiring a corporation to publicly report its financial

condition is to make the information available to all who consider it important in determining their course of action 'in any type of transaction with the corporation in question.'" *Id.* at 582.

The Texas Supreme Court first concluded that § 536 did not apply to Pacific because it had purchased securities of a different entity (InterFirst) than the one (RepublicBank) for which Ernst & Young had filed the SEC documents. Furthermore it emphatically concluded that § 536's reach does not "extend[] to open-market purchases of unrelated securities." 51 S.W.3d at 582. The high court further noted that unlike § 531, § 536 had no counterpart in Texas common law fraud jurisprudence, that other courts rarely applied it, and that because it "effectively alleviates a claimant's burden to show intent to induce reliance in fraud actions, it should be applied narrowly if at all." *Id.* The court pointed out that investors had other remedies for securities violations under federal and state securities laws, and stated that it was "reluctant to apply section 536's presumption and subject market participants to liability for fraud damages to an almost limitless class of potential plaintiffs." *Id.* Thus the Texas Supreme Court did not embrace the argument of a presumption of reliance based on a securities issuer's SEC filed documents nor apply section 536's presumption for policy reasons, specifically because doing so would create "an almost limitless class of potential plaintiffs." *Id.* at 582.

Therefore to establish fraudulent intent, Plaintiffs must allege and show more than that information was available in the investment community, pursuant to industry custom, and that it

was foreseeable that it would reach them; Plaintiffs must show that Plaintiffs' "reliance must be 'especially likely' and justifiable, and that the transaction sued upon must be the type the defendant contemplated." *Id.* at 580. *See also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 323-34 (5th Cir. 2002)(construing and applying *Pacific Mutual*)("It is therefore insufficient for a plaintiff to allege 'what is commonly 'known' or 'expected,' because 'even an obvious risk that a third person will rely on a representation is not enough to impose liability'")(*citing Pacific Mutual*, 51 S.W.3d at 581). Plaintiffs have failed to do so here.

Apart from these significant pleading deficiencies, the Court finds that Plaintiffs satisfied the other elements of a claim for violation of § 27.01(d) of the Texas Business and Commerce Code against Merrill Lynch. They have alleged facts demonstrating that Merrill Lynch had actual awareness of the falsity of Enron's financial statements in year-end 1999 because of the transactions it participated in that manufactured substantial "income" to make Enron's financial statements deceptively positive, as well as awareness of the falsity of its own analysts' reports and "buy" recommendations, which were based on those misleading financial statements, all of which were used to induce Plaintiffs and other investors to enter into contracts for the purchase of Enron securities. They have alleged that Merrill Lynch failed to disclose anything until the government's

investigations after Enron filed for bankruptcy and that Tilney has invoked the Fifth Amendment when asked for disclosure.

Merrill Lynch allegedly received substantial financial benefits, stated in dollars and percentage returns, from Enron for its services relating to the Nigerian Barge and Power Trades Transactions and for it's participation in LJM2.

The factual allegations about Tilney are sufficient to show that he had actual awareness that the Nigerian Barge and Power Transactions were being used to help Enron cook its books and manipulate its 1999 SEC 10-K and 10-Q reports, which he did not disclose and regarding which, at least in part, he invoked his Fifth Amendment rights.  The complaint does not, however, allege facts showing that he, individually, benefitted from the false representations.  To exempt this claim against Tilney from Rule 9(b) and to state a claim against him in his individual capacity, Plaintiffs would have to show that the information was "peculiarly within the perpetrator's knowledge," that the information was and still is not available from any other source, and that they made diligent attempts to obtain such information.  Absent facts demonstrating that Tilney personally benefitted from the false representations, and if Plaintiffs can adequately allege a duty to disclose and intent to induce reliance, the claim should go forward against Tilney only in his official capacity.

**D.   Common Law Fraud**

As indicated above more specificity is necessary in identifying particular misrepresentations by Enron arising out of

its transactions with Merrill Lynch to satisfy Rule 9(b) and Plaintiffs must adequately plead reliance.

Again, for their pleading of fraud against Tilney in his individual capacity, his invocation of the Fifth Amendment does not excuse Plaintiffs from pleading with specificity. As noted, *Baxter* recognized "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions" applies only "when they refuse to testify **in response to probative evidence offered against them**." 425 U.S. at 318 [emphasis added by this Court]. Plaintiffs have not alleged any material misrepresentations or omissions made by Tilney in his individual capacity. To warrant an exception to the Rule 9(b) pleading-with-particularity requirement at this stage of the litigation, Plaintiffs must show that his alleged fraud was "peculiarly within" Tilney's knowledge and that the information is not available from any other source, as well as what efforts Plaintiffs made to obtain such information. Moreover, if they are contending that his silence constituted fraud, they need to allege facts and cite legal authority showing that in his individual capacity he had a duty to disclose some specified information to the investing public.

## E. Conspiracy to Defraud

First, as indicated, to establish a derivative conspiracy claim, Plaintiffs must adequately allege the underlying fraud claim.

Otherwise, the Court finds that with regard to the Nigerian Barge and Power Trades Transactions Plaintiffs have pled facts suggesting a meeting of the minds of Enron and Merrill Lynch officials, a concert of action, and overt acts in furtherance of the conspiracy to allow Enron to "cook its books," file false and unlawful SEC reports, and deceive the investing public, including Plaintiffs, about Enron's financial condition.

Accordingly, for the reasons stated above, the Court

ORDERS that Merrill Lynch's and Tilney's motions to dismiss the holding claims are GRANTED.  Thus all claims brought by Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company are therefore DISMISSED.

Tilney's motion to dismiss Plaintiffs' unspecified Texas Securities Act claims as time-barred is DENIED.  Provided that more specificity about Enron's misrepresentations is submitted, the Texas Securities Act claims may go forward.

The remaining portions of the motions to dismiss are currently DENIED to allow Plaintiffs an opportunity to cure the pleading deficiencies.  Plaintiffs are GRANTED leave to supplement their First Amended Complaint, but should defer doing so until the Court resolves Merrill Lynch's pending motion for partial summary judgment, which the Court is currently reviewing.  When it issues its decision on the motion for partial summary judgment, it will establish a new pleading schedule.

**SIGNED** at Houston, Texas, this 6th day of  day of June, 2007.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE